**NORBY LUMBER COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–392C.**

United States Court of Federal Claims.

Feb. 4, 2000.

---

**48**

Gary G. Stevens, Washington, DC, for plaintiff. Richard W. Goeken, Saltman & Stevens, P.C., of counsel.

Kent G. Huntington, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. James Rosen, Department of Agriculture, San Francisco, CA, of counsel.

## *ORDER*

MILLER, Judge.

This case is before the court after briefing on defendant's motion for partial dismissal of Counts I–III of plaintiff's complaint for lack of subject matter jurisdiction. Argument is deemed unnecessary.

## FACTS

The following facts are drawn from the complaint. The United States Forest Service, Department of Agriculture (the "Forest Service") awarded the Path timber sale contract to Norby Lumber Company ("plaintiff") on November 29, 1993. The contract involved the harvest and sale of 2,060 thousand board feet of merchantable timber, plus significant volumes of lodgepole pine and cull logs, in the Pineridge Ranger District of the Sierra National Forest in Region 5 of the Forest Service in the State of California. The original termination date of the contract was March 31, 1996. Negotiations, which took place throughout the contract term, enabled the parties to extend the termination date.

In a letter to Contracting Officer Alan Quan and Sierra National Forest Supervisor Boyanton dated June 28, 1996, plaintiff raised certain concerns about the potential environmental consequences of contract performance and stated its position that the cancellation or suspension of the contract would be in the best interests of all parties. On July 17, 1996, plaintiff delivered a copy of that letter to the Chief of the Forest Service and, in an accompanying memorandum, reiterated its request for a cancellation or suspension of the contract. By letter dated July 24, 1996, the Forest Supervisor denied plaintiff's request. By letter dated August 8, 1996, the Chief of the Forest Service also denied plaintiff's request.

On August 1, 1996, the contracting officer informed plaintiff that the contract was eligible for a one-year term extension offered by

the Forest Service to qualifying purchasers. The parties began discussions of this option. By contract modification signed on August 14, 1996, the parties extended the periodic payment determination date to July 21, 1997, and the contract termination date to September 23, 1997. As part of the modification agreement, plaintiff was required to sign a release of liability should the Forest Service subsequently cancel the contract for environmental reasons.

Following this contract extension, plaintiff allegedly obtained new information which raised additional concerns regarding the environmental risks posed by contract performance and confirmed the seriousness of the environmental risks previously identified. Plaintiff brought this information to the attention of the contracting officer and the Regional Forester in a letter dated July 9, 1997. In the letter plaintiff again sought cancellation or suspension of the contract. A similar request was made to the Chief of the Forest Service on July 10, 1997. Plaintiff's requests again were denied.

In a letter dated August 21, 1997, plaintiff requested that the contracting officer further extend the contract termination date and the periodic payment due date to June 29, 1998. On September 2, 1997, the contracting officer responded by agreeing to extend the contract termination date, but refusing to adjust the periodic payment due date. Enclosed with this response was a bill for the periodic payment, in the amount of $389,814.00, due on September 17, 1997. On September 5, 1997, plaintiff sought an additional extension. By letter dated September 23, 1997, the contracting officer placed plaintiff in breach of contract and suspended the sale for failure to make the periodic payment. Plaintiff was given 30 days to remedy the breach. However, the September 23, 1997 letter also indicated that the contracting officer was "conditionally" extending the contract termination date, pending resolution of plaintiff's September 5, 1997 request, until October 23, 1997. By letter dated October 1, 1997, the contracting officer offered to modify the contract termination date to August 25, 1998. The letter gave plaintiff until October 23, 1997, to execute this modification and to make the

overdue periodic payment or plaintiff would be placed in breach of contract. Plaintiff took neither action.

On March 13, 1998, the contracting officer sent plaintiff a letter stating that the timber sale had been terminated as uncomplete and that, as of October 23, 1997, plaintiff was in default on the contract. The letter also stated that resale of the contract would violate certain federal regulations and that plaintiff therefore would be responsible for the full price of the contract. Enclosed was a bill for $219,193.83. The Forest Service established this figure by subtracting plaintiff's down payment on the sale, $191,400.00, from the total contract price, $404,593.83. On June 18, 1998, the contracting officer forwarded a bill for collection to plaintiff in the amount of $220,231.41, which included all interest. The accompanying letter noted that this was "the final decision of the contracting officer."

On July 24, 1998, plaintiff submitted a claim to the contracting officer for (1) the return of its down payment of $191,400.00; (2) the reimbursement of its unamortized costs accrued in preparing to perform on the contract of $67,686.00; and (3) the out-of-pocket costs incurred of $9,162.00 plus interest. The contracting officer denied plaintiff's claims in their entirety on December 11, 1998. On June 18, 1999, plaintiff filed this suit seeking the above listed amounts. Counts I–III of the complaint assert that plaintiff was excused from performing the contract because the Forest Service failed to comply with certain provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 (1994), and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 (1994). The predicate of defendant's motion is that these claims do not sound in contract.

## DISCUSSION

1. *Standard for a motion to dismiss*

When a federal court reviews the sufficiency of the complaint, pursuant to a motion to dismiss for lack of subject matter jurisdiction, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue

is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* To this end, the court must accept as true the facts alleged in the complaint, *see Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988), and must construe such facts in the light most favorable to the pleader. *See Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995) (holding courts obligated "to draw all reasonable inferences in plaintiff's favor"). It is well-settled doctrine that a complaint will not be dismissed for lack of subject matter jurisdiction "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Therefore, when the facts alleged in the complaint reveal "any possible basis on which the nonmovant might prevail, the motion must be denied." *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed. Cir.1988) (citations omitted).

■ The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *See Reynolds*, 846 F.2d at 748. At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *National Wildlife Fed.*, 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114–15 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 527 n. 6, 95 S.Ct. 2197,

45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the party invoking federal jurisdiction in the action, plaintiff bears the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

*2. Jurisdiction*

■ The jurisdiction of the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C.A. § 1491 (West 1994 & Supp.1999), which provides in relevant part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C.A. § 1491(a)(1). While conferring jurisdiction, the Tucker Act does not create a substantive right enforceable against the United States for monetary damages. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541 (Fed.Cir.1996). Thus, a plaintiff must found its claim on a separate statute or regulation permitting monetary recovery. *See Testan*, 424 U.S. at 398–401, 96 S.Ct. 948.

■ Defendant argues that Counts I–III must be dismissed because these claims are only cognizable under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 500 (1994). It is well established that the APA does not confer a substantive right that is enforceable against the United States for money damages. *See Testan*, 424 U.S. at 400, 96 S.Ct. 948. For this reason "the APA may not form the basis for jurisdiction in the Court of Federal Claims." *Faulkner v. United States*, 43 Fed.Cl. 54, 55 (1999). Disputing defendant's classification of these claims, plaintiff argues that Counts I–III are

cognizable under the Contract Disputes Act, 41 U.S.C.A. § 601 (West 1987 & Supp.1999) (the "CDA"). The CDA affords monetary recover for claims "relating to a contract" with the United States and thus may form the basis for this court's jurisdiction under the Tucker Act. *See id.*

■ Defendant begins argument by brandishing the same tired dicta from a Court of Federal Claims opinion that this court "is a court of exceedingly limited statutory jurisdiction." This line, unaccompanied by supporting citations, surfaces in too many government briefs that implicate the scope of the court's jurisdiction. If the Government's purpose is to render the waiver of sovereign immunity more restricted than it is, or to discourage the trial court's exercise of its jurisdiction, or to trust that other judges will adopt the formulation on the basis of familiarity, the advocacy in which the Government engages is not consistent with the Government's obligation to cite the most recent controlling authority on an undisputed point of law. Although defendant cannot glean support for its formulation from even a single court decision issued in the intervening 13 years since that opinion was issued, the Government remains undeterred, and thus the pronouncement has acquired resilience. By definition all federal courts are courts of limited jurisdiction. And "the limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Whatever modifier best describes the statutory jurisdiction of the Court of Federal Claims—and it is questionable whether "exceedingly" would fit in any comparison with the jurisdiction of other courts created by statute—the language excerpted so frequently is of little guidance, even as an introduction to the subject. It is sufficient, and more accurate, to state that "the jurisdiction of the Court of Federal Claims is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998) (citation omitted).

Defendant's substantive argument is that Counts I–III are actually APA claims in disguise and therefore must be dismissed. Plaintiff counters that Counts I–III are styled as CDA claims and make no mention of the APA. However, as defendant correctly notes, in assessing the jurisdictional basis of the claims, the court is required to look beyond plaintiff's own depiction. "Regardless of the characterization of the case ascribed by [plaintiff] in its complaint, we look to the true nature of the action in determining the existence or not of jurisdiction." *Katz v. Cisneros,* 16 F.3d 1204, 1207 (Fed. Cir.1994). Consequently, that plaintiff styled Counts I–III as CDA claims, rather than as APA claims, is not determinative.

Counts I–III assert that plaintiff is entitled to relief because the Forest Service violated NEPA and NFMA. In arguing for dismissal, defendant relies heavily upon the fact that claims for violation of NEPA or NFMA are cognizable only under the APA. This reliance is misplaced. Whether an action is founded upon a contract is determined by looking to the source of the rights upon which a plaintiff bases its claims and the nature of relief sought. *See Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C.Cir.1982). Plaintiff seeks to enforce rights vested by the contract, which allegedly accrued because the Forest Service violated NEPA and NFMA. Counts I–III alleging violations of environmental regulations, which plaintiff claims constitute a breach of the duty of good faith and entitle plaintiff to monetary damages under the contract. These claims alleging violations of NEPA and NFMA serve as the factual predicate for plaintiff's claim that the Forest Service violated the contract. The contract is the source of the rights upon which the claims are based and upon which relief is sought.

In *Region 8 Forest Service Timber Purchasers Council v. Alcock,* 736 F.Supp. 267 (N.D.Ga.1990), *aff'd,* 993 F.2d 800 (11th Cir. 1993), *cert. denied sub nom. Southern Timber Purchasers Council v. Meier,* 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994), relied on by plaintiff, a group of timber purchasers brought suit to compel the Forest Service's compliance with certain environ-

mental statutes, including NEPA and NFMA. The complaint sought relief under the environmental statutes themselves, rather than pursuant to any specific contract. The Government moved to dismiss the action arguing, ironically, that the plaintiffs' attempt to enforce statutory obligations, although not in the context of a contract, was subject to the jurisdictional requirements of the CDA simply because of the parties' contractual relationship. *See id.* The district court rejected this argument, holding that an action designed solely to enforce and to obtain relief under NEPA and NFMA, and which has no nexus to any contract, is not subject to the jurisdictional requirements of the CDA. *See id.* at 270. It is only when, as in the case at bar, a party seeks to enforce rights and obtain remedies which are created by the contract that claims fall within the ambit of the CDA.

Defendant relies on *North Side Lumber Co. v. Block,* 753 F.2d 1482 (9th Cir.), *cert. denied,* 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 (1985), to support its position. In *North Side* a group of privately held timber purchasers sought to enforce provisions of the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. § 528 (1994). *See North Side Lumber,* 753 F.2d at 1482. The effect of such a declaration might have been to void certain undesirable timber contracts held by these plaintiffs. The court held that jurisdiction was available under the APA because the obligations of the Multiple–Use Sustained–Yield Act of 1960 were "extra-contractual" and therefore not subject to the CDA. *Id.* at 1485. However, in that case contractual obligations—*e.g.,* the duty of good faith—were not implicated. Also of significance is the fact that money damages were not sought. As the Ninth Circuit stated, "even the invocation of a statutory right will not permit a plaintiff to escape the Tucker Act's exclusive jurisdiction and its preclusion of an [APA] waiver of sovereign immunity *if the relief that plaintiff seeks would have the actual effect of money damages." Id.* at 1485 n. 5 (emphasis added). In the case at bar, because plaintiff seeks money damages for breach of contractual obligations, *North Side* undercuts defendant's line of argument.

Finally, defendant contends that its motion to dismiss should be granted because plaintiff's desire to avoid contract performance coincided with its realization that it would lose money on the contract because of the depressed timber market. Only then, defendant argues, did plaintiff bring these environmental concerns to light. Plaintiff's motivations for pursuing this case are irrelevant. While the *North Side* court mentions this factor in its recitation of the facts, the suggestion that it formed a basis for its decision is not supported by that or any other opinion.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion to dismiss Counts I–III of the complaint is denied.

2. The parties shall file a Joint Status Report by February 25, 2000, proposing a course for further proceedings and a schedule therefor.