# UNITED STATES *v.* MITCHELL ET AL.

No. 78–1756.   Argued December 3, 1979—Decided April 15, 1980

MARSHALL, J., delivered the opinion of the Court, in which STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 546. BURGER, C. J., took no part in the decision of the case.

*Deputy Solicitor General Claiborne* argued the cause for the United States. On the briefs were *Solicitor General McCree, Acting Assistant Attorney General Sagalkin,* and *Robert L. Klarquist.*

*Charles A. Hobbs* argued the cause for respondents. With him on the brief was *Jerry R. Goldstein.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether the Indian General Allotment Act of 1887 authorizes the award of money damages against the United States for alleged mismanagement of forests located on lands allotted to Indians under that Act.

## I

In 1873, a Reservation was established by Executive Order in the State of Washington for the Quinault Tribe. 1 C. Kappler, Indian Affairs 923 (2d ed. 1904). Much of the land within the Reservation was forested. By 1935, acting under the authority of the General Allotment Act of 1887, ch. 119, 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.,* the Government had allotted all of the Reservation's land in trust

to individual Indians. Other enactments of Congress require the Secretary of the Interior to manage these forests, sell the timber, and pay the proceeds of such sales, less administrative expenses, to the allottees.[1]

The respondents are 1,465 individual allottees of land contained in the Quinault Reservation, the Quinault Tribe, which now holds some allotments, and the Quinault Allottees Association, an unincorporated association formed to promote the interests of the allottees of the Quinault Reservation. In four actions consolidated in the Court of Claims, the respondents sought to recover damages from the Government for alleged mismanagement of timber resources found on the Reservation. The respondents asserted that the Government: (1) failed to obtain fair market value for timber sold; (2) failed to manage timber on a sustained-yield basis and to rehabilitate the land after logging; (3) failed to obtain payment for some merchantable timber; (4) failed to develop a proper system of roads and easements for timber operations and exacted improper charges from allottees for roads; (5) failed to pay interest on certain funds and paid insufficient interest on other funds; and (6) exacted excessive administrative charges from allottees. The respondents contended that they were entitled to recover money damages because this alleged misconduct breached a fiduciary duty owed to them by the United States as trustee of the allotted lands under the General Allotment Act.

The United States moved to dismiss the respondents' actions on the ground that it had not waived its sovereign

---

[1] Current statutes relevant to the Secretary's responsibilities with respect to Indian timber resources include 25 U. S. C. § 162a (investment of funds of tribe and individual allottee); 25 U. S. C. §§ 318a, 323–325 (roads and rights-of-way); 25 U. S. C. §§ 349, 372 (issuance of fee patents to allottees or heirs found to be capable of managing their affairs); 25 U. S. C. §§ 406, 407 (sale of timber); 25 U. S. C. § 413 (collection of administrative expenses incurred on behalf of Indians); 25 U. S. C. § 466 (sustained-yield management of forests).

immunity with respect to the claims raised. The Court of Claims, sitting en banc, denied the Government's motion. 219 Ct. Cl. 95, 591 F. 2d 1300 (1979). Reasoning that Government mismanagement of the kind alleged breaches the Government's fiduciary duty under the General Allotment Act, the court held that the Act provides Indian allottees a cause of action for money damages against the United States.

We granted certiorari, 442 U. S. 940 (1979), and now reverse and remand.

## II

It is elementary that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States* v. *King,* 395 U. S. 1, 4 (1969). In the absence of clear congressional consent, then, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *United States* v. *Sherwood, supra,* at 587–588.

The individual claimants in this action premised jurisdiction in the Court of Claims upon the Tucker Act, 28 U. S. C. § 1491, which gives that court jurisdiction of "any claim against the United States founded either upon the Constitution, or any Act of Congress." The Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Testan,* 424 U. S. 392, 398 (1976). The Act merely "confers jurisdiction upon [the Court of Claims] whenever the substantive right exists." *Ibid.* The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity with respect to their claims.

The same is true for the tribal claimant. Jurisdiction over

its claims was based on § 24 of the Indian Claims Commission Act, 28 U. S. C. § 1505. That provision states:

"The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

By enacting this statute, Congress plainly intended to give tribal claimants the same access to the Court of Claims provided to individuals by the Tucker Act. The House Committee Report stated:

"As respects claims accruing after its adoption this bill confers jurisdiction on the Court of Claims to determine and adjudicate any tribal claim of a character which would be cognizable in the Court of Claims if the claimant were not an Indian tribe. In such cases the claimants are to be entitled to recover in the same manner, to the same extent, and subject to the same conditions and limitations, and the United States shall be entitled to the same defenses, both at law and in equity, . . . as in cases brought in the Court of Claims by non-Indians under section 145 of the Judicial Code [now 28 U. S. C. § 1491], as amended." H. R. Rep. No. 1466, 79th Cong., 1st Sess., 13 (1945).

See also Hearings on H. R. 1198 and H. R. 1341 before the House Committee on Indian Affairs, 79th Cong., 1st Sess., 149 (1945) (statement of Assistant Solicitor Cohen); H. R. Rep. No. 352, 81st Cong., 1st Sess., 15–16 (1949) (recodifying the statute).

Under 28 U. S. C. § 1505, then, tribal claimants have the same access to the Court of Claims provided to individual claimants by 28 U. S. C. § 1491, and the United States is entitled to the same defenses at law and in equity under both statutes. It follows that 28 U. S. C. § 1505 no more confers a substantive right against the United States to recover money damages than does 28 U. S. C. § 1491.[2]

## III

Section 1 of the General Allotment Act authorizes the President to allot to each Indian residing on a reservation up to 80 acres of agricultural land or 160 acres of grazing land found within the reservation. 24 Stat. 388, as amended, 25 U. S. C. § 331. Section 5 of the Act provides that the United

---

[2] For claims arising before August 13, 1946, however, the statute did waive the sovereign immunity of the United States. The Indian Claims Commission was directed to "hear and determine" such claims against the United States based on legal and equitable principles and on considerations of "fair and honorable dealings that are not recognized by any existing rule of law or equity." 25 U. S. C. § 70a.

Contrary to respondents' assertions, the comments of then-Representative Jackson, the sponsor of the bill that became 28 U. S. C. § 1505, do not indicate that Congress intended this statute to be a waiver of sovereign immunity for any alleged breach of trust accruing after August 13, 1946. Indeed, Representative Jackson stated that "the bill provides that with respect to all grievances that may arise hereafter Indians shall be treated on the same basis as other citizens of the United States in suits before the Court of Claims." 92 Cong. Rec. 5313 (1946). This statement is consistent with his comment that if the bill was adopted "it will never again be necessary to pass special Indian jurisdictional acts in order to permit the Indians to secure a court adjudication on any misappropriations of Indian funds or of any other Indian property by Federal officials that might occur in the future." *Ibid.* Such misappropriations could constitute takings for which just compensation is required by the Fifth Amendment, and this Court has long held that such a claim is within the jurisdiction of the Court of Claims under 28 U. S. C. § 1491. See *United States* v. *Testan,* 424 U. S. 392, 401 (1976); *United States* v. *Creek Nation,* 295 U. S. 103, 109–110 (1935); *Jacobs* v. *United States,* 290 U. S. 13, 16 (1933).

States shall retain title to such allotted lands in trust for the benefit of the allottees:

> "Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . and that at the expiration of said period the United States will convey the same by patent to said Indian . . . , in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void." 24 Stat. 389, as amended, 25 U. S. C. § 348.

Under § 2 of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 462, the United States now holds title to these lands indefinitely.

The Court of Claims held that the General Allotment Act creates a fiduciary duty on the part of the United States to manage timber resources properly and constitutes a waiver of sovereign immunity against a suit for money damages as compensation for breaches of that duty. The court drew both of these conclusions from the Act's language providing that the United States is to "hold the land . . . in trust for the sole use and benefit of the" allottee. The court held that this language created an express trust, and concluded that money damages are available to compensate for breaches of this trust, apparently because that remedy is available in the

ordinary situation in which a trustee has violated a fiduciary duty and because without money damages allottees would have no effective redress for breaches of trust.

We need not consider whether, had Congress actually intended the General Allotment Act to impose upon the Government all fiduciary duties ordinarily placed by equity upon a trustee, the Act would constitute a waiver of sovereign immunity. We conclude that the Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources.

The Act does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands. The language of § 5 that imposes the trust in question must be read *in pari materia* with the language of §§ 1 and 2.[3] Both of these sections indicate that the Indian allottee, and not a representative of the United States, is responsible for using the land for agri-

---

[3] As originally enacted, § 1 provided in pertinent part:

"[I]n all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, . . . the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon. . . ." 24 Stat. 388.

This language has not been materially altered by amendment, and is presently codified as 25 U. S. C. § 331.

Section 2 provided in pertinent part:

"That all allotments set apart under the provisions of this act shall be selected by the Indians . . . in such manner as to embrace the improvements of the Indians making the selection. Where the improvements of two or more Indians have been made on the same legal subdivision of land, unless they shall otherwise agree, a provisional line may be run dividing said lands between them. . . ." 24 Stat. 388.

This provision has never been amended, and is presently codified as 25 U. S. C. § 332.

cultural or grazing purposes. Furthermore, the legislative history of the Act[4] plainly indicates that the trust Congress placed on allotted lands is of limited scope. Congress intended that, even during the period in which title to allotted land would remain in the United States, the allottee would occupy the land as a homestead for his personal use in agriculture or grazing. See *Mattz* v. *Arnett,* 412 U. S. 481, 496 (1973); 13 Cong. Rec. 3211 (1882) (Sen. Dawes) (the allottee is to be "the occupant of the land and enjoy all its use"). See also H. R. Rep. No. 2247, 48th Cong., 2d Sess., 1 (1885); 17 Cong. Rec. 1630–1631 (1886) (Sens. Plumb and Dawes); *id.,* at 1632 (Sen. Maxey); 18 Cong. Rec. 190–191 (1886) (Rep. Skinner). Under this scheme, then, the allottee, and not the United States, was to manage the land.

The earliest drafts of the Act provided that, during the 25-year period before the allottee would receive fee simple title, the allottee would hold title to the land subject to a restraint on alienation. S. 1773, 46th Cong., 3d Sess. (1880); S. 1455, 47th Cong., 1st Sess. (1882). On Senator Dawes' motion, this language was amended to provide that the United States would hold the land "in trust" for that period. 13 Cong. Rec. 3212 (1882). Senator Dawes explained that the statute as amended would still ensure that title to the land would be transferred to the Indian allottee at the expiration of 25 years. He promoted the amendment because he feared that States might attempt to tax allotted lands if the allottees held title to them subject to a restraint on alienation. By placing title in the United States in trust for the

---

[4] A bill similar to the General Allotment Act of 1887 was debated in the Senate in 1881. See S. 1773, 46th Cong., 3d Sess. (1880); 11 Cong. Rec. 778–788, 873–882, 904–913, 933–943, 994–1003, 1028–1036, 1060–1070 (1881). Bills essentially identical to the Act as enacted in 1887 were passed by the Senate in 1882 and 1884, but were not acted upon by the House of Representatives. See S. 1455, 47th Cong., 1st Sess. (1882); S. 48, 48th Cong., 1st Sess. (1884). See also 13 Cong. Rec. 3212 (1882); 15 Cong. Rec. 2240–2242, 2277–2280 (1884); 16 Cong. Rec. 218, 580 (1885); H. R. Rep. No. 2247, 48th Cong., 2d Sess. (1885).

allottee, his amendment made it "impossible to raise the question of [state] taxation." *Id.*, at 3211. The next draft of the Act introduced in the Congress reflected this amendment, see S. 48, 48th Cong., 1st Sess. (1884), as, of course, did the Act as enacted, 24 Stat. 388 (1887). It is plain, then, that when Congress enacted the General Allotment Act, it intended that the United States "hold the land . . . in trust" not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation.[5]

---

[5] See also 15 Cong. Rec. 2240–2242 (1884) (Sens. Dawes, Coke, and Conger); *id.*, at 2278–2279 (Sens. Miller, Coke, and Dawes). Representative Skinner, who was the sponsor in the House of Representatives for the bill that became the Act, plainly defined the limited nature of the trust language found in § 5 in commenting on the rationale supporting both the Act's allotment of land and its provision that allottees shall be citizens of the United States:

"The present Commissioner of Indian Affairs, who, in the line of his duty, has given these questions his most earnest thought, says in his annual report, 1885, and reiterates it in his last report, that it should be impressed upon the Indians 'that they must abandon their tribal relation and take lands in severalty as the corner-stone of their complete success in agriculture. . . .'

. . . . .

". . . [W]henever a majority of the male adults on any reservation desire it the reservation can be broken up, and the lands, in certain quantities, specified in the bill, allotted in severalty to the Indians who belong on such reservation; and as soon as the allotment is made the allottee becomes a citizen of the United States, . . . and, in addition thereto, his land *is made inalienable and non-taxable* for a sufficient length of time for the new citizen to become accustomed to his new life, to learn his rights as a citizen, and prepare himself to cope on an equal footing with any white man who might attempt to cheat him out of his newly acquired property. . . .

"Giving the individual Indian a title to the land upon which he resides will have a tendency to stimulate him to work and improve his land and accumulate property. . . ." 18 Cong. Rec. 190 (1886) (emphasis added).

Representative Perkins summarized this approach by stating that "[t]he bill provides for the breaking up, as rapidly as possible, of all the tribal

Furthermore, events surrounding and following the passage of the General Allotment Act indicate that the Act should not be read as authorizing, much less requiring, the Government to manage timber resources for the benefit of Indian allottees. In 1874, this Court determined that Indians held only a right of occupancy, and not title, to Indian lands, and therefore that they could cut timber for the purpose of clearing the land, but not for the primary purpose of marketing the timber. *United States* v. *Cook,* 19 Wall. 591. In 1889, two years after the General Allotment Act was enacted, the Attorney General determined that the rule of *United States* v. *Cook, supra,* applied to allotted as well as unallotted lands, unless a statute explicitly provided to the contrary. 19 Op. Atty. Gen. 232. Congress ratified the Attorney General's opinion by enacting a provision authorizing the sale of dead timber on Indian allotments and reservations, but forbidding the sale of live timber. Act of Feb. 16, 1889, ch. 172, 25 Stat. 673. See also *Pine River Logging Co.* v. *United States,* 186 U. S. 279 (1902).

As time passed, Congress occasionally passed legislation authorizing the harvesting and sale of timber on specific reservations. See, *e. g.,* ch. 1350, 34 Stat. 91 (1906) (Jicarilla Apache Reservation). In 1910, Congress reversed its general policy. It empowered the Secretary of the Interior to sell timber on unallotted lands and apply the proceeds of the sales, less administrative expenses, to the benefit of the Indians. Ch. 431, § 7, 36 Stat. 857, as amended, 25 U. S. C. § 407. The Secretary was also authorized to consent to the sale of timber by the owner of any Indian land "held under a trust or other patent containing restrictions on alienations." *Id.,* § 8, as amended, 25 U. S. C. § 406 (a). The Secretary

organizations and for the allotment of lands to the Indians in severalty, in order that they may possess them individually and proceed to qualify themselves for the duties and responsibilities of citizenship." *Id.,* at 191. He asserted that one object of the bill was to enable Indians "to support themselves by industry and toil." *Ibid.*

was directed to pay the proceeds of these sales, less administrative expenses, to the "owner" of the allotted lands. *Ibid.* Congress subsequently enacted other legislation directing the Secretary on how to manage Indian timber resources.[6]

The General Allotment Act, then, cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands. Any right of the respondents to recover money damages for Government mismanagement of timber resources must be found in some source other than that Act.[7]

The judgment of the Court of Claims is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEVENS join, dissenting.

In *United States* v. *Testan,* 424 U. S. 392 (1976), we held that a statute creates a substantive right enforceable against the United States in money damages only if it " 'can fairly be

---

[6] See n. 1, *supra.*

[7] The Court of Claims did not consider the respondents' assertion that other statutes, see n. 1, *supra,* render the United States liable in money damages for the mismanagement alleged in this case. Nor did the court address the respondents' contention that the alleged mismanagement is cognizable under the Tucker Act because it involves money improperly exacted or retained. The court may, of course, consider these contentions on remand.

The respondents make two other arguments. They assert that the special relationship between the United States and Indian tribes establishes a right to money damages for timber mismanagement. They also contend that the General Allotment Act and the Treaty of Olympia, 12 Stat. 971 (1859), create trust responsibilities on the part of the United States that constitute implied contracts within the scope of the Tucker Act. Because the respondents did not raise these contentions in the Court of Claims, we will not consider them. *E. g., Adickes* v. *Kress & Co.,* 398 U. S. 144, 147, n. 2 (1970).

interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Id.,* at 400, quoting *Eastport S. S. Corp.* v. *United States,* 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1009 (1967). The Court today holds that *Testan* bars a damages suit against the Government by Indian allottees, their Tribe, and their association for breach of fiduciary duties in the management of timber lands allotted under the General Allotment Act of 1887 (Act), 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.* Because I believe that the Act can fairly be interpreted as mandating compensation, I dissent.

The Act could hardly be more explicit as to the status of allotted lands. They are to be held by the United States *"in trust for the sole use and benefit of the Indian,"* § 5 of the Act, 24 Stat. 389, as amended, 25 U. S. C. § 348 (emphasis added). The United States has here unmistakably assumed the obligation to act as trustee of these lands with the Indian allottees as beneficiaries. The Court holds, however, that the "trust" established by § 5 is not a trust as that term is commonly understood, and that Congress had no intention of imposing full fiduciary obligations on the United States. Congress' purposes, it is said, were narrower: to impose a restraint on alienation by Indian allottees while ensuring immunity from state taxation during the period of the restraint.

I do not find this argument convincing. The language of the Act, which is the starting point for all statutory interpretation, *Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205, 210 (1979); *Teamsters* v. *Daniel,* 439 U. S. 551, 558 (1979), explicitly creates a "trust." This language would surely be a sufficient manifestation of intent to create a trust if the settlor were other than the United States. See Restatement (Second) of Trusts §§ 23, 24 (1959) (hereinafter Restatement); G. Bogert, The Law of Trusts and Trustees § 45 (2d ed. 1965) (hereinafter Bogert); 1 A. Scott, The Law of Trusts § 23 (3d ed. 1967) (hereinafter Scott). The structure

created by the Act has all the necessary elements of a common-law trust—a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (the designated allotment lands). See Restatement § 2, Comment *h*, p. 10. The United States has capacity to take and hold property in trust. *Id.*, § 95; 2 Scott § 95 (discussing the Act). And an essential distinguishing feature of any trust, at common law, was that it entailed a

> "*fiduciary relationship* with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person. . . ." Restatement § 2 (emphasis added).

See 1 Scott § 2.5. Hence, if we are to give the words of the statute their ordinary meaning, as we commonly do when the law does not define a statutory phrase precisely, *Group Life & Health Ins. Co.* v. *Royal Drug Co., supra,* at 211, we should find that the trust established by the Act imposes fiduciary obligations on the United States as trustee.

The legislative history of the Act does not convince me that any narrower reading is required. This statute was enacted against the backdrop of a relationship between the United States and the Indian tribes that had long been considered to "resembl[e] that of a ward to his guardian." *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 17 (1831); see also *Morton* v. *Mancari,* 417 U. S. 535, 541–542 (1974); *United States* v. *Mason,* 412 U. S. 391, 398 (1973); *Squire* v. *Capoeman,* 351 U. S. 1, 2 (1956); *United States* v. *Payne,* 264 U. S. 446, 448 (1924); *United States* v. *Kagama,* 118 U. S. 375, 382 (1886). When Congress established a "trust" for the Indian allottees it is not sensible to assume an intent to depart from these well-known fiduciary principles. Rather, as we noted in *Mattz* v. *Arnett,* 412 U. S. 481, 496 (1973), the policy of the Act was to "*continue* the reservation system and *the trust status of Indian lands.*" (Emphasis added.)

The Court acknowledges that the Act did create a trust relationship between the United States and the allottee. *Ante,* at 542. It holds, however, that the fiduciary obligations imposed on the United States as trustee are very narrow and do not extend to the proper management of Indian timber lands. The lands covered by the Act were mostly agricultural or grazing lands, as to which it was expected that the Indian himself would reside on and manage the allotments. Not until *United States* v. *Payne, supra,* was it established that forested lands such as those of the Quinault Reservation were subject to allotment under the Act. Hence, it is said, if the Government has fiduciary duties they are solely to ensure nonalienation and immunity from state taxation.

This argument takes too narrow a view of the fiduciary duty established by the Act and of the subsequent statutory and administrative developments which clarified and fleshed out that duty. The timberlands of the Quinault Reservation cannot, as a practical matter, be managed by the Indian allottees. In such a case, where management functions must necessarily be performed by the Government, it seems most consistent with the scheme of the Act that the United States was to assume fiduciary obligations in the performance of its management functions. Subsequent Congresses have implicitly acknowledged the existence of such obligations. See 25 U. S. C. § 466 (instructing the Secretary of the Interior to manage Indian forests on a sustained-yield basis); §§ 323–325 (authorizing the Secretary to grant rights-of-way over Indian trust lands upon payment of just compensation); § 162a (authorizing the Secretary to manage tribal funds held in trust). The Secretary has promulgated detailed regulations governing the exercise of his powers under these statutes. While I do not say that the Government's fiduciary responsibility necessarily conforms to the exact terms of these statutes and regulations, their existence at least points to the inference that as a matter of statute and administrative prac-

tice the Government has accepted *some* obligations in the management of allotted timberlands.

The remaining question is whether the Government has consented to liability in damages for the breach of these obligations. Such liability, in my view, follows naturally from the existence of a trust and of fiduciary duties. It is hornbook law that the trustee is accountable in damages for breaches of trust. See Restatement §§ 205–212; Bogert § 862; 3 Scott § 205. Moreover, it would interfere with, if not defeat, the purposes of the Act if the allottees were to be remitted to a suit for prospective, equitable relief in the protection of their rights. Absent a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust. Finally, it is noteworthy that the Department of the Interior, which as the agency charged with administering the Act is entitled to considerable deference in its interpretation of the statute, *e. g., Zenith Radio Corp.* v. *United States,* 437 U. S. 443, 450 (1978); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965), apparently disagrees with the position taken by the Solicitor General in this litigation and believes that a money damages remedy should be permitted. See Letter from Departmental Solicitor Krulitz to Assistant Attorney General Moorman, Nov. 21, 1978, reprinted in App. to Brief for Respondents 1a–21a.

In sum, I would find that the Act creates a bona fide trust, imposes fiduciary obligations on the United States as trustee in the management of allotted timberlands, and provides a damages remedy against the United States for breach of these obligations. The Act " 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *United States* v. *Testan,* 424 U. S., at 400, quoting *Eastport S. S. Corp.* v. *United States,* 178 Ct. Cl., at 607, 372 F. 2d, at 1009. In my view, therefore, the

Court of Claims had jurisdiction over this action as one founded on an "Act of Congress," 28 U. S. C. § 1491, and as one brought by an identifiable group of Indians and "otherwise . . . cognizable in the Court of Claims," 28 U. S. C. § 1505. Accordingly, I respectfully dissent.