**Brenda Shelton HAYNES, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 00–575 C.

United States Court of Federal Claims.

March 6, 2002.

Brenda Shelton Haynes, Buffalo, NY, pro se.

Thomas B. Fatouros, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant.

*OPINION AND ORDER*

HEWITT, Judge.

Plaintiff, Brenda Shelton Haynes, appearing pro se, alleges breach of a mortgage contract by defendant, the United States Department of Housing and Urban Development (HUD), entitling her to $15,000 in damages. Complaint (Compl.) ¶ 2, at 1, 3. This matter is before the court pursuant to Defendant's Motion for Summary Judgment (Def.'s SJM) filed February 26, 2001, arguing that the Complaint raises no genuine issues of material fact and that defendant is therefore entitled to judgment as a matter of law.

For the following reasons, defendant's motion for summary judgment is DENIED.

I. Background

Plaintiff's father, James F. Freeman (Mr. Freeman), and Henry Davis (collectively referred to as borrowers) entered into a 20–year mortgage (Mortgage) securing a promissory note in the original principal amount of $39,000 (Note) with HUD on October 3, 1979, pursuant to HUD's Section 312 Reha-

bilitation Loan Program.[1] *See* Appendix to Defendant's Summary Judgment Motion (Def.'s SJM App.) at 45–53; *see generally* 42 U.S.C. § 1452(b). The Mortgage covered a piece of property in Buffalo, New York, which borrowers rehabilitated and maintained as a liquor business known as Henry and Mick's Place (the property). *Id.;* Plaintiff's Compliance to Court Order, filed November 30, 2001 (Pl.'s Nov. 30, 2001 Compliance) at 2. Relevant financial terms of the contract are contained either in the Mortgage or in the Note, both recorded in the Erie County (N.Y.) Clerk's Office. *See* Def.'s SJM App. at 45, 53.

The Mortgage required the borrowers to make monthly payments of principal and interest as well as monthly deposits in amounts equal to premiums on fire and hazard insurance, taxes, assessments, water rates, and other government charges. Def.'s SJM App. at 48, ¶ 7(a).[2] The deposits were to be held in escrow by HUD and used to cover the insurance premiums, taxes, and fees associated with the property. *Id.* Any escrow deposits excess to these purposes were to be credited toward subsequent monthly payments "of the same nature . . . ."[3] *Id.* at ¶ 7(c). The Mortgage also provided "If the mortgaged property is sold under foreclosure or is otherwise acquired by the Mortgagee . . . any remaining balance of the accumulations under Paragraph 7(a) [the escrow balance] hereof, shall be credited to the principal amount owing on the Note as of the date of commencement of foreclosure proceedings . . . ." *Id.*

Mr. Freeman died on December 5, 1985, and plaintiff inherited an interest in the property.[4] Compl. at ¶ 2(a). Monthly payments were made irregularly following Mr. Freeman's death. *See* Def.'s SJM App. at 20–38. On January 16, 1986, Comprehensive Marketing Systems, Inc. (CMS)[5] sent a letter to plaintiff informing her that, as of January 1, 1986, the account had an arrearage of $2,531.51 and that HUD had initiated foreclosure proceedings. Plaintiff's Compliance to Court's Order Dated May 7, 2001 (Pl.'s Compliance to May 7, 2001 Order) at Exh. B. CMS also returned to Ms. Haynes a check for $75 for the reason that the payment was "insufficient" to bring the loan current. *Id.* Defendant's records show that five payments were made in 1986: in March, April, August, September, and October. Def.'s SJM App. at 21–22. Plaintiff states that a payment of $7087.91 was made in March 1986. *See* Pl.'s

---

1. The core issue in this case at this juncture is whether defendant properly discharged its duties under the Mortgage. Because the determination of this issue is largely a question of contract interpretation, none of the facts on which the court relies in issuing this order appears to the court to be in dispute.

2. Paragraph 7(a) also required monthly payments of "ground rents," which did not apply to the property.

3. Paragraph 7(a) states that "[n]o interest shall be payable by the Mortgagee on any sum so deposited."

4. In at least two filings, plaintiff stated that she was the sole heir to James Freeman's estate. *See* Plaintiff's Opposition to Statement of Uncontested Material Facts (Pl.'s Opp. to SUMF) at ¶ 3; Plaintiff's Brief in Compliance with the Court's Order Dated August 2, 2001. In support of this assertion, plaintiff claims that an Erie County Surrogate Court decision "established conclusively" that plaintiff is Mr. Freeman's sole heir. Pl.'s Compliance with May 7, 2001 Order at ¶ 11.

The court requested and received a copy of the Erie County Surrogate Court's determination of Mr. Freeman's estate, *In re Estate of Freeman*, No. 85–6409, filed January 5, 1991 (Surrogate Court Order). *See* Order of July 31, 2001. The Surrogate Court Order did not in fact find plaintiff to be the sole heir to Mr. Freeman's estate. *See* Surrogate Court Order at 14. The court concluded that five other individuals were also distributees of the estate (distributees). *See id.; see also* Order of September 20, 2001 at 1–2.

Upon learning that plaintiff was not Mr. Freeman's sole heir, and in view of the possibility that the other distributees have an interest in the Mortgage, the court issued third-party notices to the five other distributees pursuant to Rule 14 of the Court of Federal Claims. *See* Court Order of September 20, 2001. The September 20, 2001 Order stayed the case in order to provide the other distributees with adequate time to join the litigation. *Id.* at 3. The court requested that the parties as well as the distributees provide the court with updated addresses, if any were available, for the distributees as listed in the order. *Id.* at 2. The court lifted the stay on November 28, 2001 after none of the other distributees joined the litigation. Order of November 28, 2001.

5. It appears that CMS managed the escrow account and paid insurance and taxes on the property. *See* Pl.'s Compliance to May 7, 2001 Order at Exh. B.

Opp. to SUMF at ¶ 3. That payment was credited to the escrow account, and caused the escrow account to be significantly over funded.[6] Def.'s SJM App. at 21.

By June 9, 1988, the escrow account had an accumulated balance of $15,710.71. Pl.'s Compliance to May 7, 2001 Order at 28. Correspondence in the record indicates that defendant then sought to contact the borrowers and/or plaintiff for guidance on the application of the escrow account. Id. at 29–31. The record also shows that CMS was not clear about whom to contact in connection with the escrow balance. It can be inferred from the fact that CMS addressed correspondence to Ms. Haynes on January 16, 1986 that CMS was by then aware of Mr. Freeman's death in 1985. See Pl.'s Compliance to May 7, 2001 Order at 25. In 1988, however, CMS sent a series of letters concerning the escrow account balance addressed to the late Mr. Freeman, and not to Ms. Haynes.[7] Id. at 28–31.

### A. Defendant's treatment of the overpayments

By letter dated June 23, 1988, CMS informed the borrowers[8] of the overage of $15,710.71 in the borrowers' escrow account. Pl.'s Compliance to May 7, 2001 Order App. at 28–29. The record contains no response to the June 23, 1988 letter by plaintiff or anyone else on behalf of the borrowers. The June 23, 1988 letter from CMS to Mr. Freeman contained a detachable instruction for the treatment of the escrow overage on which the borrowers could elect among the following three instructions: "[(1)] Apply overage to principal balance[; (2)] Refund the entire overage[; or (3)] Apply the overage to cure loan delinquency." Pl.'s Compliance to May 7, 2001 Order at 29. In a subsequent letter from CMS to the borrowers dated July 22, 1988, CMS stated that it had not received any communication from the borrowers instructing CMS how to apply the overage. Id. at 31. The July 22, 1988 letter also stated that "unless we hear from you by July 31, 1988 to the contrary, we will transfer $1,311.72 from your escrow account (representing the account's [then] delinquency) and apply this to your monthly payments." Id. The letter also informed the borrowers that the remaining overage of $14,398 "can be used to reduce the principal balance of the loan, applied towards future payments or a refund of this amount may be requested." Id. The record contains no response to the July 22, 1988 letter.

In a letter addressed to Mr. Henry Davis dated March 29, 1989, CMS informed Mr. Davis[9] that as of March 27, 1989 an account

---

6. According to the payment analysis spreadsheet provided by defendant, Def.'s SJM App. at 21, two separate payments received by defendant in March of 1986 total $7,087.91, the amount plaintiff states that she paid. See Pl.'s Opp. to SUMF at ¶ 3.

7. The court has scoured the documentary record compiled in the case and has been unable to determine the source or circumstances of all of the overpayments into escrow despite two requests for additional briefing and documentation from the parties. See Order of November 2, 2001 at 1–2; Order of May 7, 2001 at ¶ 1. According to defendant, "The documents in the Government's possession do not indicate the reason for this accumulation of funds." Defendant's Response to the Court's Order of November 2, 2001 Requesting Supplemental Briefing and Documentation (Def.'s Response to Nov. 2, 2001 Order) at 2. Defendant asserts that "[e]ach payment was made as a singular payment encompassing both the interest and principal amount and the amount required to be placed in escrow." Id. Plaintiff alleges without documentary support that the overpayments were "due to the defendant's habit of collecting duplicate pay-

ments from my father's estate, namely from a lockbox payment source, and, the liquor business known as Henry and Mick's Place, and, directly from the plaintiff, for ever mounting arrears and related legal fees, which were all superfluous." Pl.'s. Nov. 30, 2001 Compliance at 2. A determination of the source or circumstances of the of the overpayments into the escrow account is not a fact material to the disposition of the pending motion.

8. Notwithstanding Mr. Freeman's death in 1985, CMS addressed the June 23, 1988 letter to him.

9. The record does not contain any account of why the March 29, 1989 letter was sent to Mr. Davis. Plaintiff alleges that Mr. Davis forfeited his rights under the Mortgage because of a gambling law violation. See Plaintiff's May 14, 2001 Compliance (Pl.'s May 14, 2001 Compliance) at 2. A document attached to Plaintiff's May 14, 2001 Compliance appears to confirm that Mr. Davis was convicted of multiple violations of the New York Alcoholic Beverage Control Law on November 14, 1984, which resulted in a liquor license revocation proceeding. See id. at Exh. C,

analysis showed an escrow overage of $11,963.38 and that CMS had transferred $10,000 of this overage from the escrow account to an "unapplied account" to be used to cover future monthly payments. *See* Def.'s SJM App. at 14. The record contains no response to the March 28, 1989 letter to Mr. Davis. On April 6, 1989, $10,000 [10] (less the monthly payment for April of $389) was transferred to an unapplied account. Def.'s SJM App. at 16. The defendant thereafter utilized the balance in the unapplied account to make monthly payments under the loan until the unapplied account was depleted. *See* Def.'s SJM App. at 26–34. For example, $161.83 was transferred from the unapplied account and applied to reduce the loan principal on January 1, 1990. Def.'s SJM App. at 29. The propriety of defendant's transfer of the overage in the escrow account to an unapplied account and defendant's subsequent disbursements from the unapplied account are the bases of one of the claims raised by plaintiff's complaint.[11]

### B. Defendant's actions with regard to the foreclosure

Plaintiff's complaint states that after receiving a mortgage release, plaintiff was to receive money pursuant to the foreclosure.

Compl. at ¶ 7. In response to defendant's motion for summary judgment, plaintiff alleged that one of the two genuine issues of material fact raised in the complaint is whether the "MORTGAGE RELEASE ISSUED TO PLAINTIFF ... WAS ISSUED LAWFULLY." Pl.'s Resp. at 1. Defendant's reply brief acknowledges the fact that HUD issued plaintiff a "discharge of mortgage," but argues that the discharge does not "establish that HUD owes Ms. Haynes any payment." Defendant's Reply Brief in Support of Summary Judgment (D.'s Reply) at 1. The events leading up to the foreclosure on the property do not appear to be in dispute.

HUD transferred the excess escrow funds to an unapplied account in 1989. Defendant's Proposed Findings of Uncontroverted Facts (Def.'s Facts) at 2. HUD made some 52 separate monthly payments until the unapplied account was depleted in September of 1992. Def.'s SJM App. at 24–26 *passim.*[12] In the months and years following September 1992, no payments were made on the loan. *See* Def.'s SJM App. at 36–38; Def.'s Facts at 2–3.

Correspondence [13] between HUD's loan servicer and plaintiff on November 24, 1995 stated that the only activity in the loan account since October 10, 1992 was "payment

---

p. 24. The record also contains a credit report dated July 29, 1994 on Mr. Davis generated by Milliken and Michaels Credit Services, a credit investigation service, at the request of Ms. Leila Anatalio of Wendover Funding, Inc. *See* Pl.'s May 14, 2001 Compliance at Exh. E, pp. 30–37. The fact that Wendover sought and received such a report as well as the overall substance of the report (e.g., it contained information about Mr. Davis's last known addresses) appears to the court to indicate Mr. Davis was not directly involved with the management of the loan. *Id.*

**10.** Plaintiff alleges that the $10,000 transferred to the unapplied account "completely vanished." *See* Pl.'s Opp. to SUMF at (4)(i)(i); *see also* Def.'s Reply at 3.

**11.** Paragraph 7 of plaintiff's complaint (which prays for an accounting) can be fairly read to encompass a claim for breach of contract based on defendant's treatment of the overage in the escrow account. Plaintiff also responded to Defendant's Summary Judgment Motion by arguing that there are two genuine issues of material fact entitling her to monetary relief. Plaintiff's second issue encompasses the question of whether

the borrowers are owed money as a result of the application by HUD of the borrower's payments:

> (2) WHETHER THE PLAINTIFF IS ENTITLED TO A FULL, ACCURATE AND AUTHENTIC ACCOUNTING FROM HUD, WHICH WOULD SETTLE ONCE AND FOR ALL THE QUESTION OF WHO OWES WHO WHAT?

Response to Movant's Contentions There are No Genuine Issues With Respect to Listed Material Facts. [RCFC 56(d)] (Pl.'s Resp.) at 1.

**12.** The court reviewed the payment analysis schedule spreadsheet pursuant to the loan in this case. Defendant's assertion that funds in the unapplied account were used to make monthly payments between June of 1988 and September of 1992 appears accurate. *See, e.g.,* Def.'s SJM App. at 27 (showing $159.03 transferred from unapplied account and applied to principal on June 6, 1989).

**13.** The November 24, 1995 letter sent by Leila P. Anatalio of Wendover Loan Service Specialists to plaintiff was in response plaintiff's telephone inquires to Ms. Anatalio, William Hanson of HUD and a Carole Dewey. Def.'s SJM App. at 39–40.

of taxes and insurance, advances made by HUD for such payments, and the accumulation of late charges." Def.'s SJM App. at 40. The November 24, 1995 letter also stated that because of a 38–month period of default "the property is now being foreclosed upon" with a foreclosure sale scheduled for December 21, 1995. *Id.* On March 24, 1997, the City of Buffalo (City) also initiated foreclosure proceedings for failure to pay taxes. Def.'s SJM at 6; Def.'s SJM App. at 54–56.

On January 14, 1998, Robert L. Juenger of HUD sent the City a letter informing the City that HUD has been unsuccessful in its attempts to sell the property and that HUD would not continue to advance tax payments on behalf the owners. *Id.* at 57. After thanking the City for its patience in delaying its tax sale in order to allow HUD the opportunity to find a buyer, Mr. Juenger recommended that the City "proceed with whatever actions it deems necessary to cure the tax default." *Id.* In the period of time after the last of the funds from the "unapplied account" were depleted, plaintiff made no payments on the Mortgage. *See* Def.'s SJM App. at 36–38; Def.'s Facts at 2–3. The City sold the property on June 1, 1998. *See* Def.'s SJM App. at 58.

On June 17, 1998, CDSI Mortgage Services wrote Mr. Juenger of HUD recommending that HUD "close-out" the outstanding balance on the loan based on CDSI's review of the case file and the fact that the property had been sold by the City. *Id.* In November 1999, plaintiff sent a letter to Michael Merrill of HUD requesting that HUD "fulfill the United State's [sic] obligations under said contract (Mortgage) to forward to myself (1) A Clear Title to the real property which had been the subject of said mortgage and proof of satisfaction of said lein [sic]." Def.'s SJM App. at 62. On January 24, 2000 HUD issued a discharge of the Mortgage, which was signed by Robert Juenger. *Id.* at 63. According to correspondence[14] subsequent to the issuance of the discharge of the mortgage, plaintiff contacted CDSI Mortgage Services requesting a refund of escrow funds, to which Ms. Haynes believed she was

entitled based on her receipt of the Mortgage discharge. *Id.* at 64. The letter informed plaintiff that the " 'Discharge of Mortgage' ... *was issued to you in ERROR* ... because no funds were ever tendered to HUD, or its designee, satisfying the entire loan balance." *Id.* (emphasis in original). According to a payment analysis schedule contained in Defendant's Motion for Summary Judgment, as of March 16, 1993, $16,285.50 was still owed on the Mortgage. Def.'s SJM App. at 38.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rules of the Court of Federal Claims (RCFC) 56(c); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). A fact is material when it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies its burden, the burden shifts to the nonmovant to show that there is a "genuine issue for trial" for each issue on which it would bear the burden at trial. *Id.* at 324, 106 S.Ct. 2548.

### B. Jurisdiction

The Tucker Act, 28 U.S.C. § 1491(a)(1) (1994 & Supp. V 1999) authorizes the Court of Federal Claims to

> render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

---

14. A May 22, 2000 letter was addressed to Ms. Haynes from Denise Leigh Holley of CDSI, a mortgage services company working with HUD. Def.'s SJM App. at 64.

*Id.* This court's Tucker Act jurisdiction must be strictly construed and extends only to claims for money damages. *United States v. Testan,* 424 U.S. 392, 397–398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The Tucker Act standing alone does not create a substantive right for monetary damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 398, 96 S.Ct. 948. In order for the court to exercise its Tucker Act Jurisdiction as to a claim money damages, plaintiff's complaint must invoke a separate, substantive jurisdictional hinge such as a money-mandating constitutional provision, statute, regulation or contractual provision. *Khan v. United States,* 201 F.3d 1375, 1377–78 (Fed.Cir. 2000). The contract in this case was between Mr. Freeman, plaintiff's predecessor in interest, and the United States. In order to prevail in this lawsuit, plaintiff must demonstrate that either that contract or some other source of law authorizes the award of money damages for her claims. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

### C. Potential Claims Giving Rise to Money Damages

This matter is before the court on a motion for summary judgment. Accordingly, the court must determine whether any of the facts raised in plaintiff's complaint provide, "any possible basis on which the non-movant might prevail." *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). The court is also mindful that this is a pro se case in which the complaint is held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *accord Roche v. USPS,* 828 F.2d 1555, 1558 (Fed.Cir.1987).

Plaintiff's complaint and subsequent filings focus on two aspects of defendant's performance of its contract obligations to plaintiff under the Mortgage that might state a claim for money damages: 1) wrongdoing with respect to the treatment of the escrow overpayments, and 2) wrongdoing with respect to the state foreclosure of the property. *See* Compl.; Pl.'s Resp. at 1.

### 1. Treatment of the Escrow

The court has carefully reviewed the Mortgage and Note to identify possible bases for money damages for plaintiff's claims. In this connection, the court requested additional briefing from the parties to ascertain whether defendant's application of the escrow balance to an unapplied account was lawful under either the Mortgage itself or any other law. *See* Order of November 2, 2001 at 3. There are several contract provisions of possible relevance to defendant's treatment of the escrow balance. In particular, the Mortgage sharply limits defendant's treatment of money received from the borrower for deposit in the escrow account. Pursuant to ¶ 7(a) of the Mortgage, defendant was to hold the escrow funds in trust for enumerated purposes:

> All such amounts so deposited with the Mortgagee shall be held by the Mortgagee, or any agent designated by it, in *trust* to be used *only* for the payment of such ground rents, premiums, taxes, assessments, water rates, and other governmental charges. No interest shall be payable by the Mortgagee on any sum so deposited.

*Id.* at 48 (emphasis added).

With respect to the escrow account balance, the Mortgage contemplates the use of escrow funds to reduce the mortgage principal only in the event of a foreclosure:

> If the mortgaged property is sold under foreclosure or is otherwise acquired by the Mortgagee, after default by the Mortgagor, any remaining balance of the accumulations under Paragraph 7(a) hereof, shall be credited to the principal amount owing on the Note as of the date of commencement of foreclosure proceedings for the mortgaged property, or as of the date the mortgaged property is otherwise so acquired.

Def.'s SJM App. at 48A.[15]

Paragraph 22 of the Mortgage provided, "This mortgage may not be changed or terminated orally." *Id.* at 51. Therefore, defendant was not permitted, absent a writing that amended the terms of the Mortgage, to transfer funds out of the escrow account until the foreclosure sale. *See id.*[16]

Based on the terms of the Mortgage, defendant's only choice (absent a written amendment to the Mortgage) for the treatment of the overage in the escrow account prior to foreclosure was to hold the excess funds in the escrow account. Defendant, having received and treated the excess funds as escrow payments by placing the funds in the escrow account, was required to follow the terms of the Mortgage applicable to those funds.

Defendant's transfer of the overage to an unapplied account[17] and use of the funds for monthly payments was inconsistent with the terms of the Mortgage and Note. While the court has noted defendant's several unsuccessful attempts through its agents to obtain instructions from the borrowers as to how they wished to apply the overage, the court is not aware of any authority that would permit defendant to rely on the absence of instructions from borrowers to vary its responsibility to hold escrow funds in trust. Defendant breached its agreement with plaintiff when it transferred the escrow funds to an unapplied account.[18]

---

**15.** The Note contains a separate provision applicable to "overpayments" of principal that reserves to the borrower a right to prepay the loan. Def.'s SJM App. at 53. That provision requires that all payments on the Note "shall be applied" to reduce the original principal balance of the Note after payment of current charges:

> THE Borrower reserves the right to *prepay* at any time all or any part of the principal amount of this Note without the payment of penalties or premiums. All payments on this Note shall be applied first to the payment of late charges, if any, then to interest, and then the remaining balance *shall be applied to the reduction of the principal.*

*Id.* (emphasis added). The foregoing provision does not apply to the escrow balance.

**16.** The court requested additional briefing from the parties on the question of whether any source of law outside the Mortgage and Note, either state or federal, addresses defendant's right to transfer the funds to an unapplied account to be used to satisfy future monthly payments. *See* Order of November 2, 2001 at 2–3. Included in the foregoing, the court asked specifically whether 4 C.F.R. § 102.17, which is a joint regulation between the General Accounting Office and the Department of Justice that required defendant to identify and prevent overpayments (joint regulation), contemplated defendant's actions with respect to the overpayments. *Id.*

Neither party pointed to any source of law outside the Mortgage and Note. With respect to the joint regulation, defendant argued that it fulfilled its obligations under the joint regulation when its "loan servicer informed the mortgagors that between March 12, 1986, and June 9, 1988, funds in addition to those needed to satisfy the requirements of the mortgage contract were paid into the escrow account." Def.'s Resp. to Court's Order of Nov. 2, 2001 at 3. Defendant argued that the joint regulation requires agencies to develop procedures to identify overpayments and take corrective actions but does not mandate that compensation be paid to a borrower in the event of the government's non-compliance. *See id.* at 3, 4.

Neither party briefed the impact of Paragraph 22 of the Mortgage on the resolution of defendant's motion. The court notes that under the law of the State of New York, a modification of the terms of a mortgage is governed by the statute of frauds and must be in writing to be enforceable. *Pappas v. Resolution Trust Corp.*, 255 A.D.2d 887, 889, 682 N.Y.S.2d 494 (N.Y.App. Div.1998); *see also* N.Y. General Obligations Law § 5–703(1) (McKinney 2001).

**17.** In fact, defendant had transferred funds to an unapplied account even prior to the $10,000 transferred on April 6, 1989. *See, e.g.,* Def.'s SJM App. at 21–25. The April 6, 1989 transfer was the subject of defendant's March 29, 1989 letter to Mr. Davis. Def.'s SJM App. at 14. There is nothing in the record that indicates that the transfers made prior to April 6, 1989 were authorized or even the subject of correspondence.

**18.** The particular choice defendant made with regard to the escrow overage-to apply the excess funds to the periodic payments of principal and interest on the loan-was not only without authority but was also quite disadvantageous to plaintiff. The payment analysis schedule in defendant's filing shows a principal balance of $25,154.16 and an escrow balance of $17,093.00 on April 12, 1988. *See* Def.'s SJM App. at 24. If defendant had chosen to apply the then escrow balance of $17,093 to the then outstanding principal balance of the loan ($25,154.16), the principal balance could have been reduced to only $8,061.16. If payments thereafter remained level, accrued interest would have been reduced and the loan earlier retired, or the loan could have been restructured to reduce the amount of the monthly payments.

## 2. Foreclosure

Plaintiff's Complaint also prays for relief for alleged wrongdoing on the part of defendant with respect to the City of Buffalo's tax foreclosure and the subsequent release of the mortgage by HUD. *See* Compl. at ¶¶ 6–7.; Pl.'s Resp. at 1. Pursuant to plaintiff's claims with regard to the foreclosure sale, the court asked for supplemental briefing on defendant's legal obligations under the terms of the Mortgage with respect to the city tax foreclosure, specifically addressing whether defendant had any obligation to plaintiff 1) to obtain a price at foreclosure favorable to the mortgagor; and/or 2) to conduct a foreclosure, or to act with acquiescence to the foreclosure, in such a manner so as to preserve value in the mortgagor's interest. *See* Order of August 2, 2001 at ¶ 1.

In response to the court's request, defendant argued that neither the enabling statute, the Housing Act of 1964, 42 U.S.C. § 1452(b), nor the implementing regulations (the majority of which were repealed in 1996 [19]) create any type of obligation or duty upon HUD during a foreclosure sale by a third party. Defendant's Response to the Court's Order of August 2, 2001 Requesting Supplemental Briefing and Documentation at 2. In addition, the briefing makes clear that defendant did try to sell the property itself and only after it was unsuccessful in that effort did it acquiesce in the City of Buffalo's tax foreclosure. *See* Def.'s SJM App. at 57. Defendant also itself advanced delinquent tax payments to the City of Buffalo on behalf of plaintiff. *See id.* at 40. The court can discern no violation of the terms of the Mortgage or the Note in connection with the procedures used by defendant during the foreclosure sale.

Plaintiff alleges that she is entitled to the excess escrow funds based on her receipt of a discharge of the Mortgage following the foreclosure sale. *Id.* at 64. Defendant states that the Mortgage discharge was issued in error, but argues, "In any event, this release represents nothing more than HUD's administrative determination that it will commence no further action pursuant to the loan, not that Ms. Haynes is entitled to mortgage funds or even that Ms. Haynes fulfilled the terms of the mortgage." Def.'s SJM at 6. Defendant is correct that a discharge of mortgage, regardless of whether it is issued in error, does not automatically afford plaintiff a right to the return of escrow funds not otherwise owed.[20]

Defendant's principal argument in connection with the foreclosure is that plaintiff is not entitled to money damages because at the time of foreclosure the loan account was delinquent in the amount of $16,285.50. *See* Defendant's Supplemental Reply Brief In Support of Summary Judgment at 1; *See* Def.'s SJM App. at 38. Defendant argues that because $16,285.50 was still owed on the Mortgage at the time of foreclosure, even if HUD did not properly apply the $10,000 overage in the escrow account, plaintiff's account at foreclosure (assuming defendant had then applied the escrow balance to the principal balance) would still have remained delinquent in the amount of $6,285.50. Def.'s Reply at 3. In short, defendant argues that no matter how it treated the funds in the escrow account, plaintiff would have been owed nothing at foreclosure. *Id.* There is, however, no accounting in the record that shows the relevant account balance based on a treatment of funds in accordance with the Mortgage, and the court declines to speculate as to what such an accounting would show. On this record, the court is unable to determine whether the assertion that plaintiff was owed nothing at foreclosure-which is the core of the government's defense-is correct.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED. The parties shall, on or before, Monday,

---

19. 61 Fed.Reg. 705 (February 23, 1996).

20. It is settled law that where the issuance of a release of a mortgage is the result of mistake, inadvertence or accident, and thus not issued in accordance with the real intention of the issuing party, the release may be set aside and the mortgage reinstated. *See* 59 C.J.S. *Mortgages* § 486(b) (1998); *see generally In re Haas*, 31 F.3d 1081, 1091 (11th Cir.1994), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995).

April 15, 2002, propose a schedule for further proceedings to determine whether defendant's breach of the Mortgage requires the payment of money damages to plaintiff. The parties, if they can agree, shall propose a joint schedule or, if they cannot agree, shall propose separate proceedings and schedules therefor.

IT IS SO ORDERED.