PREGERSON, Circuit Judge,
specially concurring:
I write separately to point out the manifest injustice of releasing the federal government from responsibility in this suit. The relationship between the federal government and the tribes has been one of promises carelessly made and callously broken. Here we see that in the area of tribal housing, as in so many other areas, we as a nation have ignored the collateral consequences of our conduct toward American Indians and have utterly failed to live up to our promises. We have a moral duty, if not a legal duty, to remedy the harm caused to these Plaintiffs.
Much tribally-owned land, including the land at issue here, is held in trust “indefinitely.” 25 U.S.C. § 462. The decision to hold the land in trust was made, in part, to prevent tribes from unwisely alienating their land. As the Supreme Court noted: “[W]hen Congress enacted the General Allotment Act, it intended that the United States ‘hold the land ... in trust’ not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from the state taxation.” See United States v. Mitchell, 445 U.S. 535, 544, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (emphasis added). In so doing, we promised to guard the tribes’s property rights for a period of time, while they prepared to “cope on equal footing” with the “white man who might attempt to cheat him out of his newly acquired property.” See 18 Cong. Rec. 190 (1886) (statement of Representative Skinner).
However admirable the government’s motivations, the decision to take tribal land in trust had adverse consequences: by holding tribal land in trust and preventing alienation, the federal government prevented the tribe from developing its own private housing market. For example, in a recent publication, the United States Commission on Civil Rights reported that American Indians have consistently found it difficult to obtain mortgages on their land because the land is held in trust and therefore cannot be used as collateral. See U.S. Comm, on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country 63, available at http://www.usccr.gov/pubs/na0703/na0204. pdf [hereinafter A Quiet Crisis ]; see also H.R. Rep. 100-604 (1988), reprinted in 1988 U.S.C.C.A.N. 791, 795. Similarly, private housing developers have been deterred from entering tribal housing markets because the property, once developed, cannot be alienated. See A Quiet Crisis, at 63.
The federal government has exercised pervasive control over tribal land, and in so doing, has severely limited the tribe’s control over its own economic development. In fact, according to one House Report relating to the passage of the Indian Housing Act, HUD’s Mutual Help and Homeownership Program was the “only reasonable source of housing in many reservations,” see H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795, in part because the land was held in trust. That is, while the goal of the General Allotment Act was to prevent unwise alienation of the land, the result was to prevent any *988 encumbrance of the land for the purpose of building or improving housing. The effect was to freeze out developers from entering the private tribal housing market, and to leave the tribes with no option but to wait for the federal government to provide safe, decent, and sanitary housing.
Congress has, in more recent years, recognized that the federal government’s control over the land and its general trust relationship with the tribes creates a responsibility for the federal government to remedy the deplorable housing conditions on reservations. See Native American Housing Assistance and Self-Determination Act of 1996 (“NAHASDA”), 25 U.S.C. § 4101(2)-(5). NAHASDA recognizes that:
[T]he Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition; [Moreover,] providing affordable homes in safe and healthy environments is an essential element in the special role of the United States in helping tribes and their members to improve their housing conditions and socioeconomic status.
25 U.S.C. § 4101(4)-(5).
As suggested in the findings under NA-HASDA, the federal government’s duty to remedy tribal housing conditions existed even before NAHASDA — it derives from treaties and the “general course of dealing” with tribes. During the process of forcing the tribes onto reservations, many tribes were explicitly promised housing in exchange for land cession. See Virginia Davis, A Discovery of Sorts: Reexamining the Origins of the Federal Indian Housing Obligation, 18 Harv. BlackLetter L.J. 211, 215-23 (2002). Others were promised money that was intended to “promote their civilization.” See id. at 218-19; see, e.g., White Mountain Apache Tribe of Arizona v. United States, 26 Cl.Ct. 446, 465, 466-67 (1992).[1] The Court of Claims has held that treaty language such as the “requisites to ‘promote civilization’ ” includes a covenant to provide housing. Thus, the federal government has long promised that it would assist American Indian tribes in providing housing.
Later, when much of tribal land was taken into trust under the General Allotment Act, it was done with an eye toward ensuring that every American Indian had a “homestead of his own with assistance by the government to build houses and fences, and open farms.” See Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Comm’r of Indian Affairs, Annual Report iv-v (1885)). Henry Dawes, proponent of the General Allotment Act, stated that holding tribal land in trust as a means of “civilizing” the American Indian would not work unless housing was also provided: “If [the American Indian] starts wrong; if he comes upon the homestead and is left there with no house to put himself in ... what is to become of him? He had better never have been put there.” See Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Henry Dawes, Defense of the Dawes Act (1887)). Once again, when the government took the land in trust, it committed itself *989 to play a major role in housing the trust land’s occupants.
We have failed miserably in this duty. For much too long, our nation simply ignored our responsibility to assist the tribes in building houses. In 1966, the Bureau of Indian Affairs estimated that 75% of houses on Indian reservations and in the territory of the Alaska Natives were substandard, and that two-thirds “were too run down even to merit improvement.” See A Quiet Crisis at 52. And yet, despite the advances made in the general population with the passage of the United States Housing Act of 1937, the federal government did little to remedy the substandard housing conditions on the reservations.
When HUD finally decided to extend its aid to the tribes in the 1960s, see Susan J. Ferrell, Indian Housing: The Fourth Decade, 7 St. Thomas L.Rev. 445, 452-53 (1995), the chosen vehicle was the Mutual Help and Homeownership Program (“MHHO Program”), through which homes were to be “completed at the lowest possible cost.” U.S. Dep’t of Hous. & Urban Dev., Manual 7440.1: Interim Indian Housing Handbook 3^40 (1976). In HUD’s zeal to save money, it forced Plaintiffs’ families — and probably members of countless other tribes — to decide between rejecting HUD funding altogether or living in homes that were cheaply built, homes that tribal members knew would not withstand the Montana climate for any period of time. These Plaintiffs, understandably, chose to take what they could get. And, as a result, Plaintiffs now live in homes infested with black mold and other toxins, plagued with structural disintegration, and that have caused high incidence of kidney failure, cancer, headaches and bloody noses in the home’s residents. Yet many Plaintiffs remain in MHHO housing because, in many cases, “it is the only housing they can afford.” See Jessie McQuil-lan, Rotten Deal, Missoula Indep., April 6, 2006, available at http://www.missoula-news.com/News/N ews.asp?no=5625.
Even after this situation was brought to HUD’s attention, the federal government refused to step in and remedy the harm. Before filing this- suit, Plaintiffs tried unsuccessfully for years to obtain funding to repair their houses, but their pleas fell on deaf ears. As HUD’s counsel stated at oral argument, despite HUD’s present desire to try to settle the case, Congress has not allocated sufficient discretionary funding to allow HUD any latitude to alleviate this most grievous situation on the Blackfeet Reservation.
The lack of affordable housing alternatives and the federal government’s callousness to Plaintiffs’ suffering have condemned Plaintiffs to live in dangerous houses that are making them sick. Under the theories presented here, we cannot offer Plaintiffs any relief against HUD. But our nation’s responsibility to the Blaekfeet Tribe and its members is deeper than a legal responsibility; it is also a moral responsibility. If we are serious about this duty, the federal government should recognize the consequences of its actions. We as a nation should live up to the promises that we have made. We should come to the assistance of the men, women, and children who will continue to live in absolute squalor until we step in.

. Indeed, the Blackfeet Indian signed such a treaty. Treaty with the Blackfoot Indians, art. X, October 17, 1855, 11 Stat. 727 ("The United States further agree to expend annually, for the benefit of the aforesaid tribes of the Blackfoot Nation, a sum not exceeding fifteen thousand dollars annually, for ten years, in establishing and instructing them in agricultural and mechanical pursuits, and in educating their children, and in any other respect promoting their civilization and Christianization.”)