# In the United States Court of Federal Claims

No. 11-358C

(Filed: November 15, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **RONALD J. HELFERTY,** | ) Claim by discharged Navy veteran for |
| | ) reinstatement and back pay; denial of relief |
| | ) by the Board for Correction of Naval |
| **Plaintiff,** | ) Records on remand from the court; Military |
| | ) Pay Act, 37 U.S.C. § 204(a); sufficiency of |
| **v.** | ) evidence of ingestion of cocaine; alleged |
| | ) ineffective assistance of counsel in a |
| **UNITED STATES,** | ) proceeding before an Administrative |
| | ) Discharge Board; criteria governing |
| **Defendant.** | ) performance of counsel |
| | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Raymond J. Toney, Woodland, California, for plaintiff.

John S. Groat, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This military pay case is before the court following a remand to the Board for Correction of Naval Records ("the Board"). Having received a further adverse decision by the Board, plaintiff, Ronald J. Helferty, has renewed his military pay claim before this court, filing a Motion for Judgment on the Administrative Record. *See* Pl.'s Mem. of Law in Support of Mot. for Judgment on the Administrative Record and for an Evidentiary Hearing on the Claim of Ineffective Assistance of Counsel ("Pl.'s Mem."), ECF No. 27. The government has responded with a Cross-Motion for Judgment on the Administrative Record and a Partial Motion to Dismiss. *See* Def.'s Cross-Mot. to Pl.'s Mot. for Judgment Upon the Administrative Record, Cross-Mot., and Partial Mot. to Dismiss, with Addendum ("Def.'s Cross-Mot."), ECF No. 32. The case stems from Mr. Helferty's discharge from the Navy after testing positively for a metabolite of cocaine upon a randomly conducted urinalysis. Mr. Helferty contends that the Board acted arbitrarily and capriciously in finding: (1) that he failed to rebut the presumption of unlawful ingestion of cocaine following the positive urinalysis, (2) that he received effective assistance of counsel in a disciplinary hearing, and (3) that the Board is not bound by its prior decisions. Pl.'s Mem. at 1-2. Mr. Helferty also requests (4) that the court hold an evidentiary

hearing to resolve material facts in dispute regarding his claim of ineffective assistance of counsel. Pl.'s Mem. at 3.

## FACTS[1]

### A. **Naval Service and Discharge**

Mr. Helferty enlisted in the Navy in February 1989. AR LL-910.[2] By June 2005, Mr. Helferty had been promoted to Aviation Ordnanceman First Class (E-6) but then had transferred to serve as a Substance Abuse Rehabilitation Program Counselor at the Naval Branch Medical Clinic in Key West, Florida. AR LL-924 to -30. On June 30, 2005, Mr. Helferty submitted to a random urinalysis as part of the Navy's drug screening program. AR V-289 to -90, HH-414. On July 11, 2005, the testing laboratory reported that his urine sample tested positively for a cocaine metabolite, benzoylecgonine, at a measurement of 173 nanograms per milliliter. AR LL-1014. The Navy considers any level above 100 nanograms per milliliter to be positive for cocaine use. *Id*. The positive result was confirmed by an immunoassay screening and a gas chromatography/mass spectrometry test. *Id*.

Mr. Helferty maintains that he did not knowingly ingest cocaine. Pl.'s Mem. at 29. The Navy has a zero-tolerance policy, which required that Mr. Helferty be processed in response to the positive result. *See* AR Z-322; AR KK-816. The Navy initially preferred charges against Mr. Helferty via non-judicial punishment under Article 15 of the Uniform Code of Military Justice. *See* AR HH-414. Mr. Helferty exercised his right to refuse non-judicial punishment and requested a court martial. *Id*.; *see* 10 U.S.C. § 815(a). Pursuant to Rule 306(c)(2) of the Rules for Courts-Martial, the Navy denied Mr. Helferty's request for a court martial, instead referring the charges against him to an Administrative Discharge Board ("ADB"). AR HH-414; Compl. ¶ 21. On August 22, 2005, Mr. Helferty received official notice that he was being processed for administrative separation for "Misconduct – Drug Abuse." AR LL-1001. Rather than employ civilian counsel, he elected representation at the administrative board by "qualified counsel" at the expense of the Navy. *Id*. Then-Lieutenant ("Lt.") B. Vaughn Spencer of the Navy Judge Advocate General's Corps was assigned to represent Mr. Helferty before the ADB. AR LL-1003.[3]

Aspects of then-Lt. Spencer's preparations for the ADB hearing are not in dispute. The parties accept that then-Lt. Spencer arranged for Mr. Helferty to take a polygraph examination by a qualified polygraphist from the local sheriff's office, which occurred on September 23, 2005, the Friday before the hearing scheduled for Tuesday, September 27, 2005. *See* AR KK-878 to

---

[1]The recitations that follow are drawn from the administrative record of the proceedings before the Board.

[2]The administrative record is paginated sequentially and also divided into tabs. Citations to the record will first designate the tab, followed by page number, *e.g.*, AR LL-910 refers to page 910, which is located in tab LL of the record.

[3]Lt. Spencer is now serving in the Navy as a Lieutenant Commander ("LCDR").

-79, 892. The polygraphist's written report indicated "no deception" by Mr. Helferty when he stated that he did not intentionally use cocaine in 2005 generally or in June 2005 specifically. AR KK-878 to -79. Nor is it in dispute that then-Lt. Spencer arranged for two people for and with whom Mr. Helferty worked to write favorable statements regarding Mr. Helferty's character, including Commander ("CDR") Lanier, Mr. Helferty's supervisor at the clinic. *See* Pl.'s Mem. at 4-5; AR LL-1005. Whether then-Lt. Spencer asked Mr. Helferty for the names of additional potential character witnesses is disputed. *See* Pl.'s Mem. at 6; Def.'s Cross-Mot. at 33.[4]

The three-member ADB met on September 27, 2005 to address the case against Mr. Helferty. *See* AR LL-1003. During *voir dire*, then-Lt. Spencer successfully challenged the Senior Board Member for cause due to his personal experience with a family member's drug addiction, and another senior board member was appointed. AR KK-805 to -10, AR LL-1004. Then-Lt. Spencer also queried each board member about his or her opinion of polygraph results. AR KK-806 to -07, 812. No board member reported a negative view of polygraph results. *Id*. Lt. Anselm was the recorder for the proceeding. AR KK-802.[5] Lt. Anselm's opening statement reported that Mr. Helferty tested positively for cocaine and outlined the ADB's three duties (1) to determine whether, by a preponderance of the evidence, Mr. Helferty knowingly used cocaine, (2) to recommend whether Mr. Helferty be retained or discharged from the service, and (3) if discharge were recommended, whether it should be honorable, general, or other than honorable. AR KK-812 to -14. Then-Lt. Spencer's opening statement stressed Mr. Helferty's length of service and absolute denial of knowing ingestion of cocaine, including the favorable polygraph examination results. AR KK-814 to -15. Then-Lt. Spencer also stated that Mr. Helferty was subject to mandatory processing given the Navy's zero tolerance policy, and he reminded the board members that mandatory processing is not equivalent to mandatory separation. AR KK-816.

Lt. Anselm's case-in-chief consisted solely of the positive urinalysis, plus the absence of any evidence of custodial or laboratory error. AR KK-817 to -19. He called no witnesses. *Id*. Then-Lt. Spencer began his defense by outlining three proffered exhibits: (1) the polygraph examination report, (2) a report documenting serious human error in a prior unrelated urinalysis at the laboratory where Mr. Helferty's urine was tested, and (3) Mr. Helferty's most recent performance evaluations. AR KK-820 to -21. Next, then-Lt. Spencer called police Lt. Bruce Winegarden to testify by telephone. AR KK-822. Lt. Winegarden reported that he is employed by the Monroe County Sheriff's Office, headquartered in Key West, Florida and that he is the chief polygraph examiner for the Sheriff's Office. AR KK-823. Lt. Winegarden testified that he administered a single-issue polygraph examination to Mr. Helferty and that, in his opinion, the

---

[4]LCDR Spencer, in response to Mr. Helferty's later claim of ineffective assistance of counsel, stated that "despite repeated requests for possible character witnesses, [Mr. Helferty] was unable or unwilling to provide me with a list of possible witnesses on his behalf." AR T-274. Contrastingly, Mr. Helferty maintains that then-Lt. Spencer failed to seek to obtain a sufficient number of character statements "despite Mr. Helferty's repeated suggestions and offers of cooperation." AR KK-792; *see also* AR L-99 to 100.

[5]For purposes of ADB proceedings, a recorder is akin to a prosecutor.

resulting scores showed that Mr. Helferty was "overwhelmingly not deceptive" when he stated that he did not intentionally ingest cocaine. AR KK-829; *see also* AR KK-825 to -28. Lt. Winegarden indicated that the accuracy of the type of examination Mr. Helferty received is "somewhere in the mid 90's and up." AR KK-827 ("[I]t fluctuates because of some variables but the general accepted principle is up in the mid 90's."). A board member questioned why Lt. Winegarden asked Mr. Helferty whether he "intentionally" used cocaine rather than simply whether he "used" cocaine. AR KK-830. Lt. Winegarden responded that he believed the real issue was whether "he knowingly and voluntarily [took] cocaine." *Id*. As a follow-up to the board member's question, Lt. Anselm asked Lt. Winegarden whether his question to Mr. Helferty was "a standard question for [] when drug use is an issue," and Mr. Winegarden responded that it was. AR KK-831.

After Mr. Winegarden's testimony, the senior board member asked then-Lt. Spencer whether he had any further witnesses. Then-Lt. Spencer responded, "No we don't . . . [have any] more [r]espondent witnesses. I was going to call Commander [Lanier] but you have [his] character statement in there. [I] don't think that [we] need to take his time." AR KK-831.

Lt. Anselm then delivered his closing prosecutorial statement, which explicitly and markedly favored Mr. Helferty. He stated that cocaine "has to be entered into the body somehow," but "[i]t doesn't always have to be knowing, it can be unknowing. It could be the result of a mistake. [It] might not be." AR KK-832. He stressed that an exhibit tendered by respondent shows that the NAV Drug Lab in at least one other case had cross-contaminated urine samples, which resulted in inaccurate results. *See id*. He stated:

> [T]he urinalysis program is not 100 percent foolproof or error proof.
> It would be unrealistic to think that it was. It's still the best drug
> testing program that . . . any company has.
>
> But is it possible that there was some contamination [at] the drug lab,
> yes there's that possibility in this particular case. Is it possible that Petty
> Officer Helferty came into contact (with cocaine) through just, you
> know, his personal life[?] Going to a restaurant or going to a club and
> coming into contact or . . . having cocaine introduced to his body without
> him knowing it, yes it's possible.

AR KK-834. He reminded the ADB that the positive urinalysis is enough to find misconduct, but that the result gives rise to a rebuttable presumption. *Id*. He continued his closing remarks by recalling the polygraph examination that Mr. Helferty passed, though he reiterated that polygraphs are not 100 percent accurate. AR KK-834 to -35. He cautioned the board that,

> [i]t's extremely important that you [] take into consideration the evidence
> that you have. I mean, you're making a decision that is life changing one
> way or the other. Either . . . you're going to in effect end a 16 year career
> by a finding that there [was] misconduct. Or you're going to allow a 16
> year career to continue because you . . . believe that there's . . . enough

4

evidence counter to the evidence that he tested positive to suggest that, you know, it was introduced unknowingly or there was a mistake at the drug lab.

AR KK-835. Next, Lt. Anselm told the board that should they find misconduct occurred, they must make a recommendation as to whether Mr. Helferty should be retained or not, but "[i]t doesn't matter what your recommendation is, they're going to separate the individual." AR KK-836. Lastly, he stated that should they recommend separation, they must make a "fair recommendation on the type of characterization of his discharge." *Id*. He made no argument regarding the potential characterization of a discharge.

Then-Lt. Spencer began his closing remarks for Mr. Helferty by apologizing that he forgot to have Mr. Helferty make his unsworn statement earlier when presenting his defense. AR KK-836. Mr. Helferty then gave his statement, reiterating his categorical denial of knowing drug use and his inability to explain the positive urinalysis. AR KK-836 to -37. Then-Lt. Spencer began his closing remarks by arguing that the polygraph examination is substantial evidence that rebuts the presumption of drug use created by the positive urinalysis. *See* AR KK-839 to -40. Given the high level of accuracy of polygraph tests, he argued that Mr. Helferty's favorable polygraph examination, standing alone, was sufficient to rebut the presumption that Mr. Helferty had knowingly used cocaine. *See* AR KK-840. After he briefly addressed Mr. Helferty's evaluations and CDR Lanier's letter, then Lt. Spencer admitted that Mr. Helferty did not have outstanding evaluations, but that he was certainly a "dependable," "hardworking," and "reliable" sailor. AR KK-840 to -41. He noted that a number of Mr. Helferty's lower than average marks had to do with his appearance (*i.e.*, body fat and body mass index) and physical test results, not job performance. AR KK-841. He commented that mistakes occur in drug testing labs, but also said, "I doubt [a mistake] happened in this case because the drug lab here is good. Commander Gus is very good at his job. But there is that possibility." AR KK-842. He concluded his closing remarks by requesting that should the board return a finding of misconduct, a general discharge should be granted. AR KK-843 to -44.

Following then-Lt. Spencer's closing remarks, Lt. Anselm made an additional comment regarding the technical aspects of the urinalysis. He explained that a result of 173 nanograms per milliliter is 73 nanograms above the cutoff, which is a very low nanogram level of cocaine metabolite, suggesting either that Mr. Helferty used cocaine days before he was tested and the test occurred just as the cocaine was exiting his system or that a very low level was introduced to his system in the first place. AR KK-844 to -45. "There's no way to tell that. But I can tell you that at that level any expert would say that there's no way for him to feel the effects of cocaine, okay?" AR KK-845. Then-Lt. Spencer thanked Lt. Anselm for "pointing that out." *Id*. He added that he had seen much higher nanogram levels — even in the millions range. AR KK-846.

The proceeding lasted 55 minutes. The board deliberated for 45 minutes and returned a unanimous decision finding that the preponderance of the evidence supported drug abuse. *See* AR KK-846. They unanimously recommended separation via a general discharge. AR LL-1009.

In a Letter of Deficiency, then-Lt. Spencer requested that Mr. Helferty's Commanding Officer disapprove the board's decision due to insufficient evidence. AR LL-999 to 1000. He

wrote that the members "either misunderstood the proper legal standard and legal requirements, or wrongfully disregarded the overwhelming scientific evidence." AR LL-999. He further argued that once he presented the polygraph evidence, the "government bore the burden of proving that the polygraph examination did not rebut the presumption of knowing use" and that had not been pursued by the recorder. AR LL-1000. Mr. Helferty's commanding officer ultimately accepted the board's findings that Mr. Helferty committed misconduct due to drug abuse and that he be separated from service with a characterization of service as general. AR LL-997 to -98. Accordingly, on November 22, 2005, the Navy separated Mr. Helferty with a general discharge. AR JJ-740; *see also* Pl.'s Mem. at 5.

## B. *Applications for Correction of Records*

On October 24, 2006, Mr. Helferty filed his initial application with the Board, seeking correction of his naval records. AR KK-770. On March 21, 2008, the Board denied his application, finding that he failed to demonstrate any error or injustice in the ADB's decision. AR II-735. On November 6, 2008, Mr. Helferty requested that the Board reconsider its decision. *See* AR HH-408. In his application for reconsideration, he provided scenarios of innocent ingestion, scientific studies supporting the possibility of innocent ingestion, reports concerning the use of polygraph examinations by the Department of Defense and the Department of Justice, and decisions concerning innocent ingestion and the use of polygraph results by the Merit Systems Protection Board ("MSPB") and federal courts on review of MSPB decisions. AR HH-416 to -20. Mr. Helferty also renewed his claim of ineffective assistance of counsel and continued to request an in-person hearing. AR HH-423 to -26.

On November 25, 2008, the Board denied his request because he did not present any new and material evidence not previously considered by the Board. AR GG-406. Consequently, the Board denied his request for a hearing, stating that hearings are not granted as a matter of right and are only allowed "when the Board determines that there is some indication of error or injustice and that a hearing will serve a useful purpose." *Id.*[6]

On March 12, 2009, in response to the Board's denial, Mr. Helferty filed suit in the District Court for the District of Columbia. *Helferty v. Pfeiffer*, No. 1:09-cv-00483 (D.D.C. 2009); *see* AR AA-350. On May 15, 2009, Mr. Helferty and the Board submitted a Joint Stipulation of Dismissal by which the Board agreed to adjudicate the application for reconsideration on its merits and to appoint an entirely different three-member board than the one that considered his initial application. AR AA-350 to -51.

On September 16, 2009, the Board advised Mr. Helferty, through counsel, that the Board was reconsidering his application, advised him as to the materials they would consider, and invited him to respond to the advisory opinions provided to the Board by the Navy. AR R-261. On October 14, 2009, Mr. Helferty submitted his responses. AR Q-225 to -34. On December 16, 2009, the Board denied Mr. Helferty's request to correct his naval records, again finding that

---

[6]Reportedly, the Board has not conducted an evidentiary hearing within the last twenty years. *See* Eugene R. Fidell, *The Boards for Correction of Military and Naval Records: An Administrative Perspective*, 65 Admin. L. Rev. 499, 502 (2013).

"the evidence submitted was insufficient to establish the existence of probable material error or injustice." AR P-210 to -11.

## C. *Prior Proceedings in this Court*

On June 7, 2011, Mr. Helferty filed suit in this court. *See Helferty v. United States*, 101 Fed. Cl. 224 (2011). During the Board's reconsideration of Mr. Helferty's application on the merits in the fall of 2009, it had requested and received a statement from LCDR Spencer addressing Mr. Helferty's claim of ineffective assistance of counsel. That statement was designated as confidential on privacy grounds and was not made available to Mr. Helferty. Mr. Helferty consequently was not given an opportunity to respond to LCDR Spencer's statement. *Id*. at 226. When Mr. Helferty filed suit in this court, the government asked LCDR Spencer to waive his rights under the Privacy Act, allowing the government to provide his statement to Mr. Helferty and enabling Mr. Helferty to respond to it. *Id*.; Def.'s Cross-Mot. at 6. After receiving LCDR Spencer's consent to provide his statement to Mr. Helferty, the government moved to remand the case to the Board for further consideration with the benefit of Mr. Helferty's response to LCDR Spencer's statement. *Helferty*, 101 Fed. Cl. at 226. Mr. Helferty agreed to a remand of the case, but requested that this court order the Board to hold an in-person hearing. *Id*. at 227. While in cases where the facts are in dispute and credibility is at issue, "the court ordinarily would require that an evidentiary hearing be conducted at which percipient witnesses may testify and be cross-examined," the court declined to order the Board to adopt any particular procedure. *Id*. at 228-29 ("The Board may shape its own procedures to fit the circumstances at hand."). Because correction boards retain wide statutory discretion respecting their procedures, the court equally rejected the government's contention that Mr. Helferty should be limited to written submissions to the Board and Mr. Helferty's contention that the Board was required to hold an in-person hearing. *Id*. at 228-29. The court did, however, order the Board to provide "adequate procedures of its devising to find facts and make credibility determinations. In that regard, the Board may, if it wishes, refer the matter to a hearing officer for initial determinations." *Id*. at 229.

## D. *The Board's Proceedings on Remand*

On December 7, 2011, the Board provided Mr. Helferty with a copy of LCDR Spencer's statement, AR N-190 to -99, and Mr. Helferty submitted his rebuttal on March 16, 2012, AR L-96 to -104, M-182 to -88. The Board requested and received further comment on Mr. Helferty's rebuttal and application from LCDR Spencer, AR I-80 to -84, the Navy Personnel Command, Office of Legal Counsel, AR G-70 to -74, and the Office of the Judge Advocate General, AR K-90 to -94. On remand, the Board did not heed the court's suggestion to refer the disputed factual issues to a hearing officer for initial determinations of fact and credibility, although the Board allowed Mr. Helferty numerous opportunities to respond to LCDR Spencer's several statements as well as the advisory opinions of Navy legal officers. Specifically, Mr. Helferty received copies of the advisory opinions and comments, AR F-52 to -68, and he provided a written response on August 1, 2012, AR E-32 to -50. In his response, he included a new declaration from CDR Lanier regarding his recollection of then-Lt. Spencer's preparations for the ADB hearing. AR E-45 to -46. LCDR Spencer received Mr. Helferty's response, AR D-27 to -29, and

submitted a further commentary on September 14, 2012, AR C-22 to -23. Finally, Mr. Helferty responded to the last statement by LCDR Spencer. AR B-19 to -20.

In a decision dated December 19, 2012, the Board again denied Mr. Helferty's application for correction of his naval records. AR A-1 to -17. A new three-member panel was comprised of senior civilian attorneys employed by the Navy's Office of General Counsel. AR A-3. The Board considered almost the entire administrative record, including the advisory opinions it had requested, LCDR Spencer's statements, and Mr. Helferty's responses. AR A-3 to -4. It expressly did not consider the Board's prior decisions by other panels, Mr. Helferty's pre-service use of marijuana, or Mr. Helferty's performance evaluation that he received subsequent to being notified of the positive drug test. AR A-4. The Board stated that it did not hold an in-person hearing because "the issues are well developed and any additional statement would be cumulative or repetitive in nature and would not materially add to the evidence now of record." *Id*.

In concluding that Mr. Helferty failed to show any injustice or error in the ADB's original decision, the Board found that there was no direct evidence that his positive urinalysis was a false positive. AR A-5. Regarding the polygraph, the Board did not find that error or injustice resulted from the apparently unavailing weight that the ADB members had given to Mr. Helferty's favorable polygraph examination by Lt. Winegarden. AR A-6.

Much of the Board's decision on remand focused on Mr. Helferty's claim of ineffective assistance of counsel. Overall, the Board found that "[then-Lt.] Spencer conducted a focused, tightly protected defense, presented in a manner to preclude the Recorder from attacking the evidence presented on [Mr. Helferty's] behalf." AR A-7. The Board assumed without deciding that the *Strickland* standard applied to Mr. Helferty's ineffective assistance of counsel claim. *Id*.[7] As such, they considered LCDR Spencer's choices in the context in which he made them, *i.e.*, (1) the ADB members were scientifically literate, (2) Mr. Helferty's performance reviews were average, and (3) Mr. Helferty never presented a factual basis for his innocent-ingestion defense or described his activities preceding the test. *Id*. The Board found that it was reasonable for then-Lt. Spencer to take steps to prevent the Recorder from having the opportunity to cross-examine either CDR Lanier or Mr. Helferty about Mr. Helferty's whereabouts and activities in the days preceding the urinalysis and his performance records. AR A-6 to -9. The Board stated that Mr. Helferty's claim of ineffective assistance of counsel "treat[ed] every misstep or supposed misstep by [then-]L[t.] Spencer as evidence of inadequate representation and that any gap in the record must be read in [his] favor." AR A-15.

---

[7]Every criminal defendant, whether before a military or a civilian tribunal, is entitled to effective assistance of counsel in conducting his or her defense. *See* U. S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984); *United States v. Cain*, 59 M.J. 285, 294 (C.A.A.F. 2004). The Supreme Court in *Strickland* developed a two-part test for determining whether a criminal defense attorney's assistance was deficient. First, the criminal defendant must show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*.

In his application for reconsideration, Mr. Helferty had presented additional polygraph evidence to the Board to support his contentions that he was telling the truth when he stated that then-Lt. Spencer had assured him he would not be found guilty of drug abuse if he passed a polygraph and that he offered to make character witnesses available for interviews and statements. AR L-100, -115 to -16. The Board gave little weight to this additional evidence, citing a discrepancy between the use of the word "assured" in the polygraph examination and the word "thought" in Mr. Helferty's declaration to the Board. AR A-16 (finding that whether then-Lt. Spencer "assured" him that he would be found not guilty if he passed a polygraph test or "thought" that the ADB would find him not guilty if he passed a polygraph test were "quite different things.").

The Board largely rejected the importance and applicability of the scientific studies presented by Mr. Helferty, opining that none of the studies truly suggested that Mr. Helferty could have been casually, unknowingly exposed to cocaine and tested at the levels he did. AR-10 to -12. Finally, the Board also assigned little weight to the good-character statements obtained by Mr. Helferty's counsel, finding that these statements indicated he was a "good and reliable person who [wa]s unlikely to have used illegal drugs," but "[s]uch statements do not establish by [a] preponderance of the evidence . . . that [he] did not wrongfully use cocaine." AR A-16.

E. *The Pending Claims*

Mr. Helferty seeks review of the Board's latest decision denying his application for correction of his naval records and requests that the court order an evidentiary hearing on his claim of ineffective assistance of counsel. Pl.'s Mem. at 1. A hearing was held on September 24, 2013 and the case is ready for disposition.

**JURISDICTION**

The Tucker Act, 28 U.S.C. § 1491(a)(1), authorizes claims for monetary relief to be brought against the United States "founded either upon the Constitution, or any [a]ct of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Although granting this court jurisdiction, the Tucker Act does not create a substantive legal right. *United States v. Mitchell,* 445 U.S. 535, 538 (1980). Claimants must also identify a separate source of substantive law creating the right to money damages. *Id.* In this case, Mr. Helferty relies on the Military Pay Act, 37 U.S.C. § 204(a), to provide that source. The Military Pay Act is a money-mandating statute that creates a substantive legal right enforceable against the United States for the salary of the rank to which a service member "is appointed and in which he serves." *Smith v. Secretary of the Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004). Mr. Helferty claims that his naval records should be corrected to reflect that he was not involuntarily separated for drug use and that he continued to serve on active duty until he reached retirement eligibility at twenty years of active service. Such a correction would entitle Mr. Helferty to back pay, benefits, and allowances, allegedly totaling $141,336.00, subject to offsets. Compl. ¶ 2, 3. The government does not dispute this court's jurisdiction over Mr. Helferty's claims.

**STANDARDS FOR REVIEW**

The parties have submitted cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the Court of Federal Claims. The court's review of military cases is limited. *See Groves v. United States*, 47 F.3d 1140, 1144 (Fed. Cir. 1995) ("[N]o court is qualified to review the substantive merits of a decision [committed to the discretion of the military], so long as the decision comports with any procedural standards mandated by statute or regulation."). Specifically, "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province[,] and . . . courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). The standard of review applied by this court in these cases "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." *Id.* at 1157. "In reviewing a military board's decision under the substantial evidence rule, 'all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion.'" *Riser v. United States*, 93 Fed. Cl. 212, 217 (2010) (quoting *Heisig*, 719 F.2d at 1157).

**ANALYSIS**

Mr. Helferty initially posited four claims: (1) the Board improperly failed to adhere to its prior precedent, (2) Mr. Helferty rebutted the presumption that he knowingly and willfully ingested cocaine, (3) Mr. Helferty received ineffective assistance of counsel at the ADB, and (4) the Board abused its discretion in failing to hold an in-person hearing. Pl.'s Mem. at 1-2; Compl. ¶¶ 65, 75, 84, 92. Mr. Helferty has since abandoned his claim that the Board abused its discretion in failing to hold an in-person hearing. Pl.'s Mem. at 1. As a result, the court will only address the first three claims.

A. ***Whether the Board is Bound by its Prior Decisions***

Mr. Helferty contends that the Board is "under a legal obligation to decide similar cases in a similar manner." Pl.'s Mem. at 32 (citing *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011)). This contention has merit insofar as it indicates that an agency would be arbitrary and capricious if it treated identically situated cases radically differently. The government also correctly states, however, that "there is no 'require[ment] [that] an agency [] grapple with every last one of its precedents, no matter how distinguishable.'" Def.'s Cross-Mot. at 25 (quoting *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1120 (D.C. Cir. 2010)).

Mr. Helferty refers to two prior cases decided by the Board, arguing that they present similar factual patterns but were decided differently. Pl.'s Mem. at 32-34. In both cases, applicants had been separated for drug abuse. In the first case, the Board corrected an applicant's records after considering his thirteen years of positive service, the low level of tetrahydrocannabinol ("THC"), a metabolite for marijuana, in his system, and his plausible defense of innocent ingestion. Pl.'s Mem. at 33. The government avers that this prior case is distinguishable on its facts. Def.'s Cross-Mot. at 26. The applicant's wife had testified that she

10

had purchased granola in bulk from a health food store and that the applicant had been eating the granola. AR HH-729 to -30. A Navy pharmacologist submitted a report to the ADB, stating that both marijuana and hemp will produce THC, that granola frequently contains hemp oil and hemp seeds, and that tests have shown positive urinalyses from the consumption of hemp products. *Id.*; Def.'s Cross-Mot. at 27. Also, the applicant's commanding officer had disagreed with the ADB's recommendation for separation and had strongly recommended that the applicant be retained on active duty. AR HH-730. The second case cited on behalf of Mr. Helferty is similar. The Board corrected an applicant's records after finding that her defense of innocent ingestion was persuasive. AR HH-725. The applicant had legally purchased a variety of Chinese herbal medicines, and drug tests on the substances she was consuming tested positive for marijuana. AR HH-721 to -22; Def.'s Cross-Mot. at 26. The key difference between those cases and the instant case is the other applicants' plausible explanations of innocent ingestion, where Mr. Helferty had offered no comparable innocent route of ingestion.

That the Board did not explicitly distinguish these two prior cases provides no reason to set aside the Board's decision. An agency is not required to distinguish every prior case that bears some similarity. *See Jicarilla Apache Nation*, 613 F.3d at 1120. The instant case is factually distant from *Wilhelmus*, 796 F. Supp. 2d 157, where the district court found that the Army Board for the Correction of Military Records could not reasonably treat two virtually identical cases differently. In *Wilhelmus*, a cadet at the U.S. Military Academy repeatedly failed his physical fitness tests and was eventually disenrolled for that reason. *Wilhelmus*, 796 F. Supp. 2d at 159. The government sought to recoup tuition fees from him, and the Army Board had concluded that he owed the money because his failure to pass the fitness tests was "voluntary." *Id.* In a prior case before the Army Board, however, a cadet who was disenrolled for failure to pass the physical fitness tests, was not found to have "voluntarily" failed to complete contractual requirements and was thus not liable for the tuition. *Id.* at 163. The two situations were nearly identical, and the court held that the Army Board had acted incorrectly when it offered no rationale for treating them differently. *Id.* Mr. Helferty's case, on the other hand, is not comparable to the prior cases he cites. Thus, to the extent a Board is required to treat like cases alike, the Board did not fall short of that duty in this case.

## B. *On Rebutting the Presumption of Unlawful Ingestion of Cocaine*

Mr. Helferty argues that he rebutted the presumption of knowing and willful cocaine use that resulted from his positive urinalysis and that the Board's failure to correct his naval records accordingly is not supported by substantial evidence. Pl.'s Mem. at 16. According to Mr. Helferty, the character statements, polygraph examination results, and scientific evidence that he submitted to the Board, together with his military performance record, essentially required the Board to overturn the decision of the ADB for error or injustice. *See* Pl.'s Mem. at 16-31; *see also* 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice . . . . [S]uch corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department."). The government maintains that the Board adequately considered the evidence and was not required to find an error or injustice in the ADB's decision. *See* Def.'s Cross-Mot. At 15.

Mr. Helferty submitted a number of character statements to the Board. The statements invariably describe Mr. Helferty as an honest man, and many of the persons providing the statements related that they did not believe he used drugs. *See* Pl.'s Mem. at 17-21. The government stresses that the Board was entitled to assign little weight to the "broad, general opinions that Mr. Helferty is a good person and was a dedicated sailor, and, for that reason, was not likely to have used illegal drugs." Def.'s Cross-Mot. at 18. Contrary to Mr. Helferty's assertions that the Board outright rejected these character statements, the Board considered them and explained why they were insufficient to demonstrate a legal error in the ADB's original decision. AR A-16. They amounted to opinion evidence, and none of them could address with any certainty whether Mr. Helferty used cocaine. *Id*. The court does not find that the Board was required to assign them greater weight.

Mr. Helferty also submitted a second polygraph examination result to the Board, confirming Lt. Winegarden's results. Pl.'s Mem. at 24; AR KK-849 to -50. Mr. Helferty contends that the Board's consideration of the polygraph evidence was inconsistent. He argues that on the one hand, the Board found it insufficient to overturn the ADB's decision, but on the other hand, it was sufficient evidence that then-Lt. Spencer presented a "focused, tightly protected defense." Pl.'s Mem. at 25 (quoting AR A-7). The government does not respond to this alleged inconsistency. While the ADB or the Board arguably could have been swayed by the polygraph evidence, their failure to be so persuaded is not arbitrary and capricious. The Board had to weigh two different pieces of conflicting scientific evidence, the positive urinalysis and the favorable polygraph examination. That the Board found the polygraph evidence insufficient to rebut the presumption of willful drug use that results from a positive urinalysis is not unreasonable.

The Board also carefully considered the scientific studies presented on Mr. Helferty's behalf, to support innocent ingestion. AR A-10 to -15. Mr. Helferty pressed the argument to the Board that the positive unrinalysis could have been attributable to casual contact with a person who had just used cocaine, which might have occurred during Mr. Helferty's work as a drug counselor, or casual contact with cocaine contaminated money. AR A-10. The Board explained that while the proffered scientific studies did suggest the possibility of innocent ingestion in general terms, they do not explain it in Mr. Helferty's particular case. AR A-11. For example, one study examined whether those who work in a laboratory that processes cocaine samples for use as training aids for drug-sniffing dogs would test positive for cocaine. AR A-11 to -12, HH-481 to -84. Only two urine samples out of 233 showed presence of benzoylecgonine above 100 nanograms per milliliter, the actionable cut-off for the Navy. AR HH-482. The laboratory staff wore protective clothing in most cases, and the study concluded that much further research was needed, including the use of control groups, to better understand the contamination risks. AR HH-481, 484. The Board reasonably concluded that even though Mr. Helferty worked as a drug counselor, his exposure to cocaine likely did not reach the level of exposure in the laboratory study, where only several people tested above the limit. AR A-11 to -12. Another study showed that some non-drug-users tested positive when living with drug users. *See* AR HH-499 to 500. Mr. Helferty never claimed to have repeated, intimate exposure to a habitual drug user. Similarly, the Board considered a number of other studies submitted by Mr. Helferty, finding that while all of them admit of some possibility of innocent ingestion for bank tellers handling contaminated money, undercover agents working with drug dealers, etc., the studies showed that

12

contamination risks are low and positive urinalysis results are rare. AR A-12 to -15. Additionally, the Board received an advisory opinion from the Navy's Public Health Center, which advised that the Navy's cutoff level is "well above passive inhalation levels or normal everyday environmental contamination exposure levels." AR V-282. Mr. Helferty never provided any proof that he had anything other than passive inhalation or normal everyday environmental exposure. The Board was not required to infer from these studies that casual contact with contaminated money or a cocaine user could have caused Mr. Helferty's positive urinalysis.

Lastly, regarding Mr. Helferty's performance record, he asserts that his record suggests he was an honest, loyal, and successful sailor. The Board accepted that Mr. Helferty may have been all of those things, but it disagreed that his record showed cause for overturning the ADB's decision. AR A-8 to -9. Again, the Board is not required to draw Mr. Helferty's suggested inference from his military performance records.

Overall, the Board's responsibility was to determine whether there was legal error or injustice resulting from the ADB's decision to separate Mr. Helferty due to the positive drug test. The Board's decision not to overturn the ADB's decision reflects a consideration of all of the evidence and a reasonable interpretation of the evidence. Thus, this court will not disturb its conclusion that Mr. Helferty failed to rebut the presumption of willful ingestion of cocaine.

## C. *Effective Assistance of Counsel*

Mr. Helferty claims that then-Lt. Spencer provided ineffective assistance of counsel before the ADB, prejudicing the outcome. He contends that then-Lt. Spencer's representation fell short of the Judge Advocate General Instruction ("JAGINST") 5803.1C[8] or the Sixth Amendment right to counsel, as stated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See* Pl.'s Mem. at 35. Mr. Helferty urges this court to reach a decision on Mr. Helferty's claim without addressing whether Mr. Helferty enjoys a Sixth Amendment right to effective assistance of counsel before the ADB, stating that military record boards and judges of this court have applied *Strickland* in reviewing past separation proceedings. *Id*. (citing *Harris v. United States*, 102 Fed. Cl. 390, 419-20 (2011); *Flowers v. United States*, 80 Fed. Cl. 201, 219-221 (2008)). The government argues that the Board applied the *Strickland* standard in this case, which, while likely the wrong criterion, was harmless error insofar as the outcome was concerned. Def.'s Cross-Mot. at 29-30.

---

[8]JAGINST 5803.1C prescribes standards for and governs the "Professional Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General." Its purpose is to: "establish Rules of Professional Conduct;" "establish procedures for receiving, processing, and taking action on complaints of professional misconduct made against attorneys practicing under the supervision of [the Judge Advocate General ("JAG")];" "prescribe limitations on . . . the outside practice of law by [Navy] attorneys practicing under the supervision of JAG;" and "ensure quality legal services at all proceedings under the cognizance and supervision of JAG." Def.'s Cross-Mot., Addendum at 1-2, ECF No. 32-1.

Because *Strickland* constitutes a test developed to pertain to criminal proceedings where the Sixth Amendment right to counsel is at issue, some courts have rejected application of *Strickland* to administrative proceedings, even those with significant consequences. In *Williams v. Wynne,* 533 F.3d 360, 369 (5th Cir. 2008), the Fifth Circuit held that "the Sixth Amendment right to effective assistance of counsel [does] not apply to the appellant's non-criminal administrative discharge hearing." *Williams*, 533 F.3d at 369 (citing *Mantell v. Department of Justice Immigration & Naturalization Serv.*, 798 F.2d 124, 127 (5th Cir. 1986); *Sanchez v. United States Postal Service*, 785 F.2d 1236, 1237 (5th Cir. 1986)). Instead, the court in *Williams* applied a "competent (or qualified) counsel" standard in reviewing the representation that an Air Force Reservist received before an Air Force ADB. *See id*. at 369 n.6. The Fifth Circuit applied that standard based on the language in the reservist's Notification of Initiation of Separation Action, and it further stated that "[t]he right to have qualified counsel appointed does not necessarily create a coordinate right to effective assistance of counsel under the Sixth Amendment." *Id.* Cases in this court addressing claims under the Military Pay Act have applied the *Strickland* test to an administrative separation proceeding and to resignation in lieu of a court-martial, assuming but not deciding that it is the applicable test. *See e.g., Lopez-Velazquez v. United States*, 85 Fed. Cl. 114, 137-138 (2008); *Sinclair v. United States*, 66 Fed. Cl. 487, 495 (2005), *aff'd*, 192 Fed. Appx. 966 (Fed. Cir. 2006).

The analysis in *Williams* is persuasive. Mr. Helferty was ordered to be discharged through an administrative separation process regulated by provisions of the Naval Military Personnel Manual ("MILPERSMAN"), NAVPERS 15560D, *available at* http://www.public. navy.mil/bupers-npc/reference/milpersman/pages/default.aspx (last visited Nov. 15, 2013). His separation process specifically was governed by MILPERSMAN 1910-146, Separation By Reason of Misconduct – Drug Abuse. *See* AR LL-1001; *see also* Def.'s Cross-Mot, Addendum at 134. Mr. Helferty received notification of his impending hearing before the ADB via form NAVPERS 1910/31, which allowed him to elect "representation at an administrative board by qualified counsel." AR LL-1001. MILPERSMAN 1900-010 defines key words for Article 1910. "Qualified counsel" means "[c]ounsel qualified per [Uniform Code of Military Justice] [A]rticle 27(b) who does not have any direct responsibility for advising the convening authority or separation authority on the proceedings involving the respondent." MILPERSMAN 1900-010(1)(t) (revised Sept. 20, 2011). Article 27(b) of the Uniform Code of Military Justice states that counsel:

(1) Must be a judge advocate who is a graduate of an accredited law school or is a member of the bar of a Federal court or of the highest court of a State; or must be a member of the bar of a Federal court or of the highest court of a State; and
(2) Must be certified as competent to perform such duties by the Judge Advocate General of the armed force of which he is a member.

10 U.S.C. § 827(b). Given this statutory language and the Sixth Amendment's inapplicability to proceedings before administrative boards, Mr. Helferty's claim is appropriately analyzed under the qualified counsel standard. In this context, qualified means competent, as recognized by the Fifth Circuit in *Williams* and by Article 27(b)(2) of the Uniform Code of Military Justice.

14

The inquiry thus becomes whether Mr. Helferty received representation by qualified counsel during his ADB hearing. Without a doubt, then-Lt. Spencer's representation of Mr. Helferty before the ADB was less than perfect. He completed work on his major defense strategy, a favorable polygraph examination, only four days before the hearing. AR T-276. Mr. Helferty is correct to question what then-Lt. Spencer was prepared to present if the polygraph result was not favorable. Pl.'s Mem. at 40. Then-Lt. Spencer omitted to call potential character witnesses to testify on Mr. Helferty's behalf ostensibly because he was concerned that character witnesses would not perform well on cross-examination due to Mr. Helferty's average military performance record. AR T-273 to -74. This is not a compelling reason not to call witnesses who would testify they had never witnessed Mr. Helferty do drugs and would not have believed he did.[9]

Mr. Helferty also points to then-Lt. Spencer's failure to adduce evidence to support an innocent ingestion defense, such as by coupling possible scenarios of innocent ingestion with scientific studies supporting the plausibility of innocent ingestion. Pl.'s Mem. at 36. LCDR Spencer stated that he questioned Mr. Helferty repeatedly about possible scenarios in which he might have been slipped cocaine, noting that in the past he has had success with such defenses. AR V-273. Even before the Board, Mr. Helferty supplied no account of his activities in the several days preceding the random urine test. The board viewed that omission as relevant to its decision. *See* AR A-7 ("Your lack of an explanation regarding how cocaine was innocently in your urine could have proven to be problematic for your defense.").[10] As for then-Lt. Spencer's failure to introduce scientific studies, the court agrees with Mr. Helferty that then-Lt. Spencer should have emphasized the scientific possibility of passive inhalation or environmental exposure, but this shortcoming hardly rises to the level of incompetence of counsel when the scientific studies are of little value and applicability in the first place. As discussed *supra,* these studies are helpful only when coupled with relevant factual scenarios.

What is perhaps most concerning to the court is that the Recorder, Lt. Anselm, provided a more vigorous defense of Mr. Helferty in some ways than did then-Lt. Spencer. Lt. Anselm was the one who pointed out the very low level of cocaine metabolite found in Mr. Helferty's system. AR L-166. He told the board that this low-level of metabolite made it possible that Mr. Helferty truly never felt the effects of any cocaine in his system. AR L-167. The low level could have been due to unknown ingestion or knowing ingestion that occurred days before the testing, *id.*, but at the very least it showed Mr. Helferty was not a chronic cocaine user because his levels would have been much higher, *see* AR HH-493. In his presentation to the ADB, then-Lt. Spencer should have addressed the implications of the low level observed in the urinalysis, even though the members were medical professionals. Lt. Anselm also stated that mistakes *do* occur in testing, AR L-157, whereas then-Lt. Spencer, evidently trying to make strategic concessions, *see* AR I-83, stated that a mistake was unlikely in this case, AR L-160.

---

[9]Separately and additionally, whether Helferty provided names of additional character witnesses and then-Lt. Spencer affirmatively chose not to contact them is in dispute, but resolving that dispute would not significantly advance the inquiry into counsel's competence.

[10]This court takes no stance on whether it believes Mr. Helferty knowingly ingested cocaine. The question before the court is whether the Board's decision upholding the ADB's decision was supported by substantial evidence.

It is disputed whether then-Lt. Spencer told Mr. Helferty that he "thought" the polygraph evidence would be enough to return a finding of no drug abuse, whether he "assured" him of it, or whether he merely said it would be helpful. *See* Pl.'s Mem. at 37; AR I-81. While an attorney would be ill-advised to "assure" a client of any outcome, any expression of probability of success by then-Lt. Spencer could not reasonably have been interpreted as anything other than an opinion. This particular factual dispute does not weigh heavily in determining whether Mr. Helferty received competent assistance of counsel.

The Board requested several advisory opinions regarding Mr. Helferty's claim of ineffective assistance of counsel. Captain Michael Quinn, on behalf of the Rules Counsel in the Office of the Judge Advocate General, opined that then-Lt. Spencer had not violated the Rules of Professional Conduct. *See* AR K-90 to -92. The brief opinion considered that then-Lt. Spencer was a "properly trained, certified, and experienced defense counsel who had defended numerous clients before courts-martial and administrative boards, to include allegations involving drug use." AR K-91. Captain Quinn pointed to then-Lt. Spencer's successful objection during *voir dire*, the polygraph evidence, the evidence of prior cross-contamination at the same drug lab, and Mr. Helferty's failure to present a plausible innocent-ingestion defense as reasons to find that then-Lt. Spencer did not violate any standards. AR K-91 to -92.[11]

The Board also considered the opinion of Lt. Col. Colby Vokey (USMC, Ret.) submitted on behalf of Mr. Helferty. *See* AR M-182 to -88. Lt. Col. Vokey was a long-serving Judge Advocate in the United States Marine Corps. From 2003-2008, he served as the Regional Defense Counsel for the Western Region of the United States and Iraq, supervising over 100 Marine Corps and Navy defense counsel. AR M-182. He found that then-Lt. Spencer provided ineffective assistance of counsel based on (1) his failure to call a single character witness at the hearing, (2) his complete reliance on the polygraph test as a defense, and (3) his failure to present a stronger defense of innocent ingestion, including Mr. Helferty's potential for environmental exposure at work. AR M-185 to -86. The Board considered Lt. Col. Vokey's analysis and determined that he did not sufficiently consider the context in which then-Lt. Spencer made his strategic decisions. AR A-7. In the Board's view, Lt. Col. Vokey failed to consider that the ADB was scientifically literate, Mr. Helferty's performance reviews were average, and there was no factual basis for an innocent-ingestion defense. *Id.* Although the criticisms levied by Lt. Col. Vokey against then-Lt. Spencer's representation of Mr. Helferty are significant, when the facts are applied to a qualified counsel standard, they cannot support a finding that then-Lt. Spencer was "unqualified."

In the preceding discussion, the court has interpreted disputed facts in a light most favorably to the plaintiff, and for that reason, the court declines to remand this case to the Board to conduct an evidentiary hearing regarding Mr. Helferty's ineffective assistance of counsel

---

[11]A prior advisory opinion had explained that the Office of the Judge Advocate General "does not make determinations with respect to effective assistance of counsel pursuant to the Sixth Amendment of the U.S. Constitution, a matter properly vested with a court of law." AR S-265. Accordingly, the prior opinions and Captain Quinn's opinion only addressed whether then-Lt. Spencer violated the Navy Rules of Professional Conduct.

claim.[12]  Even assuming Mr. Helferty is correct in his assertions, then-Lt. Spencer satisfied the standards for "qualified counsel."  He presented a rationale for his choices during the representation, and while the court disagrees with several of those decisions, it cannot find that then-Lt. Spencer breached his duties as Mr. Helferty's counsel.

## CONCLUSION

For the reasons stated, the government's motion for judgment on the administrative record is GRANTED.  The plaintiff's motion for judgment on the administrative record is accordingly DENIED.

The clerk is directed to issue a final judgment in accord with this disposition.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[12]Mr. Helferty requests that the court conduct this evidentiary hearing itself, Pl's Mem. at 3, but, as the government properly points out, this court is not empowered to hear evidence *de novo* when a matter has previously been presented to a military corrections board.  *See* Def.'s Cross-Mot. at 11 ("[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry, and instead the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting *Walls v. United States,* 582 F.3d 1358, 1367 (internal quotations omitted))).  If Mr. Helferty's claims had not been presented to the Board, the court could consider the case as an initial matter, receiving evidence and resolving factual disputes.  *See Martinez v. United States*, 333 F.3d 1295, 1303-04 (Fed. Cir. 2003) (observing that since their inception, military boards have been regarded as a "permissive administrative remedy . . . [,] not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge.").